1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re APPLIED SIGNAL TECHNOLOGY,

INC. SECURITIES LITIGATION

_____

This Document Relates To: All Actions.

_____

Master File No. C 05-1027 SBA

<u>CLASS ACTION</u>

**ORDER**

[Docket Nos. 25, 35, 36]

     This matter comes before the Court on the Motion to Dismiss Plaintiff's Consolidated Amended Class Action Complaint (the "Consolidated Amended Complaint") [Docket No. 35] filed by Defendants Applied Signal Technology, Inc., Gary Yancey, and James Doyle (collectively "Defendants") and Plaintiff's Motion for Class Certification [Docket No. 25]. Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. The Court hereby GRANTS Defendants' Motion to Dismiss [Docket No. 35] and DISMISSES Plaintiff's Consolidated Amended Class Action Complaint WITH PREJUDICE. Accordingly, the Court DENIES Plaintiff's Motion for Class Certification [Docket No. 25] AS MOOT.

<u>**BACKGROUND**</u>

**A.**    **Background Regarding the Parties**

      **1.**    **Applied Signal Technology, Inc.**

    Defendant Applied Signal Technology, Inc. ("Applied Signal" or the "Company") is a California corporation and a publicly traded company with over 11 million shares of stock outstanding. CAC[1] at ¶ 15. The Company's financial year is not concurrent with the calendar year. Instead, it ends on the last

---

[1]The Consolidated Amended Complaint is referred to herein as "CAC."

day of October of each calendar year and commences on the first day of November for that calendar

year. *See* Harris-Sutton Decl. at Ex. H (FY04 Form 10-K).[2]

Applied Signal's corporate headquarters are located in Sunnyvale, California. CAC at ¶¶ 7, 23-

24; Harris-Sutton Decl. at Ex. H. The Company also maintains engineering offices in Annapolis

Junction, Maryland; Salt Lake City, Utah; Herndon, Virginia; and Hillsboro, Oregon. Harris-Sutton

Decl. at Ex. H. As of January 24, 2004, the Company had 425 employees. CAC at ¶¶ 27, 38(a). This

number increased to 450 in February 2004, and to 480 employees in May 2004. *Id.* As of December

17, 2004, the Company had a total of 498 employees. Harris-Sutton Decl. at Ex. H. Of these 498

employees, 290 employees worked within the Company's engineering organizations. *Id.*

Applied Signal is in the business of supplying various United States government agencies with

customized communications signal processing systems, which it designs, develops, and installs. CAC

at ¶ 27. Since 1984, the United States government and various governmental agencies have accounted

for almost all of the Company's revenues. *Id.* Although the government agencies are the Company's

primary customer, purchases occur in two ways: (1) contracts directly with the government, and (2)

subcontracts to prime contractors. *See* Harris-Sutton Decl. at Ex. H. Within the Company's primary

customer agencies, the Company has contracts with approximately twenty different offices, each with

separate budgets and contracting authority. *Id.*

In the past two fiscal years, just under three quarters of the Company's contracts were "cost

reimbursement" contracts, including contracts for the design, installation, and/or servicing of customized

products. CAC at ¶ 25. Under these contracts, the Company is reimbursed for direct and indirect costs

and paid a negotiated profit. *Id.* However, the Company is not entitled to payment until after its

employees provide the services delineated in the contract. *Id.* Further, most of the Company's contracts

contain a provision that allows the Company's customers to force Applied Signal to stop work on all or

---

[2]For example, for fiscal year 2004, the first quarter consisted of the months of November 2003, December 2003, and January 2004; the second quarter consisted of the months of February 2004, March 2004, and April 2004; the third quarter consisted of the months of May 2004, June 2004, and July 2004; and the fourth quarter consisted of the months of August 2004, September 2004, and October 2004.

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1    any part of a contract at any time through what is referred to as a "stop-work order" ("SWO").  *Id.*

2       The federal regulations governing stop-work orders further describe the applicable process as

3    thus:

4       (a)  The Contracting Officer may, at any time, by written order to the Contractor, require the Contractor to stop all, or any part, of the work

5            called for by this contract for a period of [up to][3] 90 days after the order is delivered to the Contractor, and for any further period to which the

6            parties may agree. The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the

7            Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the

8            work covered by the order during the period of work stoppage. Within a period of 90 days after a stop-work order is delivered to the

9            Contractor, or within any extension of that period to which the parties shall have agreed, the Contracting Officer shall either –

10

11          (1)  Cancel the stop-work order; or

12          (2)  Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the

13             Government, clause of this contract.

14      (b)  If a stop-work order issued under this clause is canceled or the period of the order or any extension thereof expires, the Contractor shall

15           resume work. The Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both, and the

16           contract shall be modified, in writing, accordingly, if –

17          (1)  The stop-work order results in an increase in the time required for, or in the Contractor's cost properly

18             allocable to, the performance of any part of this contract; and

19          (2)  The Contractor asserts its right to the adjustment within 30 days after the end of the period of work stoppage;

20             provided, that, if the Contracting Officer decides the facts justify the action, the Contracting Officer may

21             receive and act upon a proposal submitted at any time before final payment under this contract.

22

23      (c)  If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, the Contracting

24           Officer shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

25

26   _____

27      [3]Revisions to the regulations provide that the 90-day period may be reduced to less than 90 days. *See* 48 C.F.R. 52.242-15.

28

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(d)   If a stop-work order is not canceled and the work covered by the order is terminated for default, the Contracting Officer shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

48 C.F.R. 52.242-15.  Thus, when a SWO is issued, it is possible, but not necessarily definite, that future revenues may be affected.  *Id.*; CAC at ¶ 26.

As such, the Company does not recognize revenue on its cost-reimbursement contracts until costs – including labor, materials, and other direct costs and estimated direct costs – are incurred.  CAC at ¶ 26.  The Company refers to future revenues relating to uncompleted portions of existing contracts as its "backlog."  *Id.*  The Company's backlog is discussed in Company press releases, conference calls, and formal Securities Exchange Commission ("SEC") filings.  *Id.*  However, in each of the Company's public filings, with respect to future revenues, and other contingent events, the investing public is expressly warned that any statements regarding future events are "not guarantees of future performance and are subject to certain risks."  *See* Harris-Sutton Decl. at Ex. A (FY03 Form 10-K).  For example, the Form 10-K for Fiscal Year 2003 states the following:

This Annual Report on Form 10-K contains **forward-looking statements** made pursuant to the provisions of Section 21E of the Securities Exchange Act of 1934.  These forward-looking statements are based on management's current expectations and beliefs, including estimates and projections about our industry.  Forward-looking statements may be identified by the use of terms such as "anticipates," "expects," "intends," "plans," "seeks," "estimates," "believes," and similar expressions, although some forward-looking statements are expressed differently.  Statements concerning financial position, business strategy and plans or objectives for future operations are forward-looking statements.  **These statements are not guarantees of future performance and are subject to certain risks, uncertainties, and assumptions that are difficult to predict and may cause actual results to differ materially from management's current expectations.**  Such risks and uncertainties include those set forth herein under "Summary of Business Considerations and Certain Factors that May Affect Future Operating Results and/or Stock Price" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." The forward-looking statements in this report speak only as of the time they are made and do not necessarily reflect management's outlook at any other point in time.  **We undertake no obligation to update publicly any forward-looking statements, whether as a result of new information, future events, or for any other reason.  However, readers should carefully review the risk factors set forth in other reports or documents we file from time to time** with the Securities and Exchange Commission (SEC) after the date of the Annual Report. These SEC filings, as well as our latest annual report, can

4

United States District Court
For the Northern District of California

be obtained through our website at www.appsig.com. In addition, hard copies can be obtained free of charge through our investor relations department.

*Id.* (emphasis added).

Further, the Company provides the following explanation regarding its backlog to the investing public:

> Our **backlog** . . . **consists of anticipated revenues** from the uncompleted portions of existing contracts[.] . . . **Anticipated revenues included in backlog may be realized over a multi-year period**. We include a contract in backlog when the contract is signed by us and by our customer. We believe the backlog figures are firm, subject only to the cancellation and modification provisions contained in our contracts. (See Item 7: "Management's Discussion and Analysis of Financial Condition and Results of Operations–Backlog.") **Because of possible future changes in delivery schedules and cancellations of orders, backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period, and actual sales for the year may not meet or exceed the backlog represented. We may experience significant contract cancellations that were previously booked and included in backlog.**

*Id.* (emphasis added).

### 2.     The Individual Defendants

At all times relevant to this action, defendant Gary Yancey ("Yancey") was the Chairman, President, and Chief Executive Officer ("CEO") of Applied Signal. CAC at ¶ 8. As the CEO, Yancey signed and certified all SEC quarterly and annual reports. *Id.* Additionally, he owned shares of the Company's stock; although, during the period between January 3, 2005 and January 18, 2005, he sold over forty percent of his holdings. *Id.* Also during this period of time, defendant James Doyle ("Doyle") was the Company's Chief Financial Officer ("CFO") and Vice President of Finance. *Id.* at ¶ 9. As the CFO, Doyle participated in quarterly earnings report conference calls for the quarters ending in July and October 2004 and January and April 2005. *Id.* Doyle also signed and certified all SEC quarterly and annual reports. *Id.*

### 3.     Plaintiffs

Lead Plaintiff Frank Whiting ("Plaintiff"), is a common stock purchaser who purchased shares of Applied Signal during the relevant time period, August 24, 2004 and February 22, 2005 (the "Class

United States District Court

For the Northern District of California

Period"). CAC at ¶¶ 6, 14. The other members of the proposed class are persons or entities – other than the Company, its officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which the Company has a controlling interest or of which the Company is a parent or subsidiary – who purchased Applied Signal common stock during the Class Period. *Id.* at ¶ 14.

**B.    Background Regarding the Confidential Witnesses**

The allegations contained in the Consolidated Amended Complaint are based, in part, on certain information obtained from the following Confidential Witnesses:

(a)    Confidential Witness No. 1. Confidential Witness No. 1 ("CW1") was employed as a software engineer during the beginning of the Class Period up until November, 2004. *Id.* at ¶ 22(a). He worked in Applied Signal's Annapolis Junction, Maryland Office. *Id.* His duties included system and process design, implementation, testing, life cycle documentation, design and code review, team tasking, and scheduling. *Id.*

(b)    Confidential Witness No. 2. Confidential Witness No. 2 ("CW2") was employed as a software engineer in Applied Signal's Maryland office until some months before the beginning of the Class Period. *Id.* at ¶ 22(b).

(c)    Confidential Witness No. 3. Confidential Witness No. 3 ("CW3") was employed as a software engineer at Applied Signal's Utah office from well before the Class Period until January 2005. *Id.* at ¶ 22(c). CW3's duties included the design and implementation of software.

(d)    Confidential Witness No. 4. Confidential Witness No. 4 ("CW4") was employed as a technical editor at Applied Signal's Sunnyvale office from before the beginning of the Class Period until November 2004. *Id.* at ¶ 22(d). He was responsible for editing and proofreading technical manuals, proposals, presentations, brochures, newsletters, and other technical and marketing material. *Id.* He was also responsible for creating processes and flowcharts for the Finance Department in accordance with Sarbanes-Oxley requirements. *Id.*

**C.    The Factual Allegations**

This action is premised on Plaintiff's theory that Applied Signal and two of its individual officers, Yancey and Doyle, (collectively, "Defendants"), knowingly issued a series of false and misleading statements regarding Applied Signal in order to artificially inflate Applied Signal's stock price throughout the Class Period. In particular, the Consolidated Amended Complaint is premised on certain representations Defendants made regarding the Company's "backlog" and certain SWOs that

6

were purportedly received by the Company during the relevant period.[4]  The Consolidated Amended Complaint is also premised on certain statements made by the Company concerning the hiring of personnel.  The pertinent facts are set forth below.

### 1.        The Third Quarter of Fiscal Year 2004

Applied Signal's third quarter for fiscal year 2004 ("FY04") commenced on May 1, 2004. During that quarter, at some point in June 2004, Applied Signal received a stop-work order ("SWO1"), which instructed the Company to stop work on a portion of the Company's largest single contract.  CAC at ¶ 29(a).  In accordance with the instructions provided by the customer, the Company prepared a proposal that detailed the tasks that were stopped and estimated the reduction in contract costs.  *Id.*

Also in June 2004 or possibly in May 2004, according to CW1, the Wireless Communications System Division of Applied Signal received another stop-work order ("SWO2") on a project for the United States military that was referred to as "Cowbird."  *Id.* at ¶ 30.  CW1 knew about SWO2 because it required employees at the Company's Maryland facility, where he worked, to stop performing services for the government agency related to the contract.  *Id.* at ¶¶ 22(a), 30(b).  According to CW2, who worked at Applied Signal up until a few months before August 2004, the contract implicated by SWO2 was worth about $8 million.  *Id.* at ¶¶ 22(b), 30(b).

On August 24, 2004, Applied Signal issued a press release and hosted a conference call ("August Conference Call") to discuss financial results for the third quarter of FY04.  CAC at ¶ 28.  Yancey and Doyle represented the Company during the August Conference Call.  *Id.*  In the course of that call, Doyle reported that the Company's backlog was approximately $111 million.[5] *Id.*

Additionally, in the August 24, 2004 press release ("August 2004 Press Release"), Yancey was quoted as saying that he was "pleased" that Applied Signal had "met the challenge" of meeting "aggressive hiring requirements."  *Id.* at ¶ 39.  During the August Conference Call, he also stated that

---

[4]Specifically, the following four SWOs are relevant to the instant discussion: (1) a June 2004 SWO ("SWO1"), (2) a May or June 2004 SWO ("SWO2"), (3) an August or September 2004 SWO ("SWO3"), and (4) a December 2004 SWO ("SWO4"). CAC at ¶¶ 29, 30, 35.

[5]Defendants did not discuss SWO1 or SWO2 during the call. CAC at ¶ 29.

United States District Court
For the Northern District of California

1   the Company had "been able to stay up with a fairly aggressive growth requirement, and in particular,

2   hiring of staff and staff that we can get cleared . . . ." *Id.* at ¶ 39.  In response to an inquiry from an

3   analyst regarding the amount of engineers that had been added during the third quarter, Doyle stated that

4   they had hired about 100 people "year-to-date" and approximately 30 people during the third quarter.

5   *Id.*  Yancey then stated that the number for the quarter might be lower – possibly as low as twenty – but

6   that analysts could "go ahead and use 30 . . . and kind of assume we've been close to linear in our

7   increase." *Id.*

8        On September 9, 2004, Defendants filed a Form 10-Q ("Third QuarterForm 10-Q") with the

9   SEC, which reported the $111 million backlog amount that was disclosed during the August 2004

10   Conference Call.  *Id.* at ¶ 29(a).  The Third Quarter Form 10-Q also reported that the Company had

11   received SWO1 and that, pursuant to SWO1, the Company was instructed to stop work on a portion of

12   its largest single contract.  *Id.*  Additionally, the report stated that "new orders and backlog [were]

13   expected to be reduced by approximately $11 to $13 million" after the completion of negotiations

14   relating to SW01 and that the Company "anticipate[d] the completion of these negotiations during the

15   first or second quarter of fiscal 2005."[6]  *Id.*

### 2.   The Fourth Quarter of Fiscal Year 2004 and Disclosures Concerning the Third Quarter of Fiscal Year 2004

18        According to CW3, who was employed as a software engineer at Applied Signal's Utah office

19   at the time, the Company also received another stop-work order ("SWO3") in August or September

20   2004.  *Id.* at ¶¶ 22(c), 35(b).  SWO3 was purportedly related to a contract with one of the Company's

21   largest customers that was worth more than $20 million.  *Id.* at ¶¶ 35(b).  CW3 was aware of SWO3

22   because he had been working on the project, which was known as "Excelsior." *Id.* at ¶ 35(b).  SWO3

23   affected the Multichannel Systems Division ("MSD") at the Utah facility, as well as the MSD group in

24   the Company's Sunnyvale, California facility.  *Id.*  At the Sunnyvale facility, approximately 50 to 75

25   workers were involved in the project.  *Id.*  CW4, who was employed as a technical editor at Applied

26   _____

27       [6]The Third Quarter Form 10-Q did not mention SWO2. CAC at ¶ 30.  In fact, to date, SWO2 has not been mentioned in any Company public filings.  *Id.* at ¶ 32.

28

United States District Court

For the Northern District of California

Signal's Sunnyvale office during August and September 2004, was aware of SWO3. *Id.* at ¶¶ 22(d), 35(b).  According to CW3, after the Company received SWO3, work on "Excelsior" stopped for approximately one week.  *Id.* at ¶ 43.  The MSD project then resumed working on the project for the remainder of the calendar year.  *Id.*  The project was abandoned in January 2005, leaving the Sunnyvale office a "ghost town."  *Id.*

On September 13, 2004, following the issuance of the Third Quarter Form 10-Q, a securities analyst covering Applied Signal's stock informed investors that he was changing the rating of the Company's stock from "buy" to "neutral."  *Id.* at ¶ 31.  The price of Applied Signal's stock dropped from $37.64, when the market opened, to $31.78 at the close of market on September 15, 2004.  *Id.*

**3.    The First Quarter of Fiscal Year 2005 and Disclosures Regarding Fiscal Year 2004**

According to CW3, the software engineer who worked in the Company's Utah office during this time, the Company also received a stop-work order in December 2004 ("SWO4").  *Id.* at ¶¶ 22(c), 35(c). SWO4 involved a government agency that had cancelled other large contracts with Applied Signal in the past.  *Id.* at ¶ 35(c).

On December 21, 2004, Applied Signal issued a press release (the December 2004 Press Release") and hosted a conference call ("December 2004 Conference Call") to discuss financial results for the fourth quarter of FY04. CAC at ¶ 33. Yancey and Doyle represented the Company during the December Conference Call and reported that the backlog for the fourth quarter was $143 million.  *Id.* The December 2004 Press Release reported that the Company earned 21 cents per share during the fourth quarter of FY04, which was below the analysts' consensus estimate of 29 cents per share.  *Id.* at ¶ 42.  Defendants did not mention SWO2, SWO3 or SWO4 during the call or in the press release. *Id.* at ¶ 35(a)-(c).

Additionally, Doyle reported, during the December 2004 Conference Call, that the Company had added a "net" of 20 employees during the fourth quarter of FY04.  *Id.* at ¶ 40(a).  Doyle then stated that the Company had "about" 500 employees.  *Id.* at ¶ 40(a).  According to the Form 10-K for FY04, the exact number was 498 employees.  *Id.*

9

The December 2004 Press Release also disclosed that revenue had only increased by 3% since the previous quarter. *Id.* During the December Conference Call, an analyst, Jay Meier ("Meier"), asked whether anything unusual had occurred during the fourth quarter since the Company had not experienced its usual increase in revenues. *Id.* at ¶ 42. Doyle and Yancey responded that Meier was reading too much into the numbers and that nothing unusual had occurred. *Id.* After the December 2004 Conference Call, the price of the Company's stock declined from $37.22 on December 21, 2004 to $35.74 at the market's close on December 22, 2004. *Id.*

Beginning on January 3, 2005, and continuing through January 18, 2005, during an open trading window, Yancey sold 141,400 shares of Company stock, which represented 43% of his total stock holdings, at prices ranging from $31.40 to $34 per share. *Id.* at ¶ 48.

On January 14, 2005, Defendants filed a its Form 10-K for FY04. CAC at ¶ 34. The Form 10-K indicated that the backlog at the end of FYO4 was $143 million but that the $143 million could be reduced by $11 million to $13 million in future quarters once negotiations relating to SWO1 concluded. *See* Harris-Sutton Decl. at Ex. H.

On February 22, 2005, the Company issued a press release (the "February 2005 Press Release") and hosted a conference call (the "February 2005 Conference Call") concerning the Company's financial results for the first quarter of FY05, which ended on January 31, 2005. CAC at ¶ 44. During the February 2005 Conference Call, the Company reported that revenue declined almost 25% from the preceding quarter, with net income and earnings per share declining as well. *Id.* To explain these financial results, Yancey stated:

> [W]e are a bit behind on execution on our contracts. Part of this is for a bit of healthy reason. We've seen higher-than-anticipated proposal activity in the first quarter, which has diverted some of our labor resources to proposal activity. The other phenomena that we're experiencing is, as we become more an integrating contractor on some of our programs, as we've stated before we are evolving to, we find that invoicing from our subcontractors can have some impact on the revenue. And we saw that some of the invoicing was lagging behind a bit compared to the work that they were putting in. So we feel that we will be back on our track of our projected revenue as we build up our own staff and as the invoicing comes about.

10

1   *See* Applied Signal Form 8-K, dated February 22, 2005 at Ex. 99.2.[7]

2          The Company's stock price subsequently dropped from $27.52 per share on February 22, 2005

3   to $23.24 at the close of the market on February 23, 2005.  *Id.* at ¶ 45.

4   **D.      Procedural History**

5          On March 11, 2005, plaintiff Brent Berson ("Berson") filed a complaint in this district on

6   behalf of himself and on behalf of all persons who purchased the securities of Applied Signal

7   between May 25, 2004 and February 22, 2005 (the "*Berson* complaint").  In the *Berson* complaint,

8   Berson alleged, *inter alia*, that Applied Signal and certain of its officers and directors violated

9   Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5

10  promulgated thereunder, and Section 20(a) of the Exchange Act, by issuing materially false and

11  misleading statements.

12         The proposed class period for the *Berson* complaint was May 25, 2004 through February 22,

13  2005 and the complaint was premised on the following allegedly false and misleading statements: (1)

14  the Company's May 25, 2004 press release concerning the Company's operating results for the second

15  quarter of FY04; (2) the Company's second quarter FY04 Form 10-Q; (3) the Company's August 24,

16  2004 press release concerning the Company's operating results for the third quarter of FY04; (4) the

17  Company's third quarter FY04 Form 10-Q; (5) the Company's December 12, 2004 press release

18  concerning the Company's operating results for the fourth quarter of FY04 and year-end results for

19  FY04; and (6) the Company's FY04 Form 10-K.  In the complaint, Berson alleged that the statements

20  were materially false and misleading because Defendants failed to disclose or indicate the following:

21  (1) that the Company lacked the staffing necessary to execute on current projects while bidding for new

22  business; and (2) that the Company "struggled to maintain adequate levels of backlog."  The *Berson*

23  complaint further alleged that the aforementioned false and misleading statements were proven false

24

25  _____

26         [7]Although this SEC filing was not provided to the Court by the parties, since the Consolidated
    Amended Complaint necessarily relies on it, the Court has taken judicial notice of it pursuant to Federal
27  Rule of Evidence 201.  *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994); *Steckman v. Hart
    Brewing, Inc.* 143 F.3d 1293, 1295 (9th Cir. 1998).

28                                                    11

*United States District Court*
For the Northern District of California

when the Company announced its operating results for the first quarter of FY05 on February 22, 2005.

On April 19, 2005, plaintiff Shalomah Sameyah ("Sameyah") filed a complaint in this district on behalf of himself and on behalf of all persons who purchased the securities of Applied Signal between May 25, 2004 and February 22, 2005 (the "*Sameyah* complaint"). With the exception of the name of the plaintiff, the *Sameyah* complaint – which was drafted by the same counsel representing Berson – was identical to the *Berson* complaint.

On May 10, 2005, this Court ordered that the *Berson* case and the *Sameyah* case be deemed related.

On May 10, 2005, plaintiff Frank Whiting filed a Motion for Appointment of Lead Plaintiff and Approval of Lead Plaintiff's Selection of Counsel ("Motion for Appointment of Lead Plaintiff").

On July 1, 2005, Defendants submitted a Statement of Non-Opposition to the Motion for Appointment of Lead Plaintiff. Defendants also requested that the *Berson* case and *Sameyah* case be consolidated by order of this Court pursuant to Federal Rule of Civil Procedure 42(a).

On July 13, 2005, the Court consolidated the *Berson* and *Sameyah* cases. Also on that date, the Court granted the Motion for Appointment of Lead Plaintiff. Accordingly, Frank Whiting was appointed to serve as Lead Plaintiff. Plaintiff's choice of counsel was also approved.

On August 12, 2005, the instant Consolidated Amended Complaint was filed. In the Consolidated Amended Complaint, Plaintiff asserts that defendants Applied Signal, Yancey, and Doyle ("Defendants") made untrue statements of material fact and/or omitted statements of material fact in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Plaintiff also contends that Yancey and Doyle directly or indirectly influenced and controlled the alleged fraudulent conduct of Applied Signal, and, therefore, are also liable under Section 20(a) of the Exchange Act. Unlike the prior *Berson* and *Sameyah* complaints, the proposed class period for the Consolidated Amended Complaint is August 24, 2004 through February 22, 2005. The Consolidated Amended Complaint also differs from the prior complaints in that it now alleges that Defendants' statements regarding the Company's backlog were materially false and misleading because they failed to mention certain stop-work orders purportedly

1   issued during May 2004 through December 2004.

2                                    **LEGAL STANDARD**

3   **A.       Federal Rule of Civil Procedure 12(b)(6)**

4              Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted if it

5   appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would

6   entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  For purposes of such a motion, the

7   complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual

8   allegations are taken as true.  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Everest and Jennings,*

9   *Inc. v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir. 1994).  All reasonable inferences are to

10  be drawn in favor of the plaintiff.  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir.

11  1999). The court does not accept as true unreasonable inferences or conclusory legal allegations cast

12  in the form of factual allegations.  *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981);

13  *see Miranda v. Clark County, Nev.*, 279 F.3d 1102, 1106 (9th Cir. 2002).

14             Although the court is generally confined to consideration of the allegations in the pleadings,

15  when the complaint incorporates documents or alleges the contents of documents, and no party

16  questions the authenticity of such documents, a court may also consider such documents when

17  evaluating the merits of a Rule 12(b)(6) motion. *See In re Stac Electronics Sec. Lit.*, 89 F.3d 1399, 1405

18  (9th Cir. 1996).

19             When the complaint is dismissed for failure to state a claim, "leave to amend should be granted

20  unless the court determines that the allegation of other facts consistent with the challenged pleading

21  could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d

22  1393, 1401 (9th Cir. 1986). The Court should consider factors such as "the presence or absence of undue

23  delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue

24  prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package*

25  *Express*, 885 F.2d 531, 538 (9th Cir. 1989).  Of these factors, prejudice to the opposing party is the most

26  important.  *See Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990) (citing *Zenith Radio*

27

28                                               13

United States District Court
For the Northern District of California

*Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971)).  Leave to amend is properly denied "where the amendment would be futile." *DeSoto v. Yellow Freight Sys.*, 957 F.2d 655, 685 (9th Cir. 1992).

**B.      Federal Rule of Civil Procedure 9(b)**

Federal Rule of Civil Procedure 9(b) provides as follows:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b).

"[The Ninth Circuit] has interpreted Rule 9(b) to require that 'allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (quoting *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)).   "The pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Schreiber Distributing Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir. 1986) (citing *Semegen*, 780 F.2d at 731).

**C.      Pleading Requirements in Securities Fraud Actions**

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b).

Rule 10b-5, promulgated under the authority of Section 10(b), in turn, provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Thus,

14

the basic elements of a Rule 10b-5 claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Systems, Inc.* 411 F.3d 1006, 1014 (9th Cir. 2005).

In order to survive a motion to dismiss, a Section 10(b) claim must satisfy three pleading standards. First, it must meet the general requirements established by Federal Rule of Civil Procedure 8(a) that complaints give a short and plain statement of the claim. Second, it must conform with the particularity requirements of Rule 9(b). *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (quoting *Semegen*, 780 F.2d at 731). Third, it must satisfy the requirements of the Private Securities Litigation Reform Act ("PSLRA").

The PSLRA employs heightened pleading standards for claims brought under Section 10(b) and, similar to Rule 9(b), requires pleading with particularity for two elements in a Section 10(b) claim: (1) falsity and (2) scienter. *See Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)). "If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, the court must dismiss the complaint." *Carol Gamble Trust 86 v. E-Rex, Inc.*, 84 Fed.Appx. 975, 977 (9th Cir. 2004).

Thus, under both the PSLRA and Rule 9(b), a plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. *See* 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b). This is accomplished by identifying either (1) inconsistent contemporaneous statements; or (2) inconsistent contemporaneous information (such as an internal document) that was made by or available to the defendants. *In re Splash Technology Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, *13 (N.D. Cal. 1997); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). "A plaintiff may satisfy [Rule 9(b)] through reliance upon a presumption that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors." *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995). In cases where the falsities are conveyed in "group-published information," for example, in press releases and annual reports, "it is reasonable to presume that these are the collective actions of

the officers." *Id.* In such a case, a plaintiff satisfies Rule 9(b) "by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations." *Id.; see also In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 2005 U.S. Dist. LEXIS 21469 (N.D. Cal. 2005).

The "recent trend among the Ninth Circuit district courts is that plaintiffs must state with particularity facts indicating that an individual defendant was directly involved in the preparation of allegedly misleading statements published by an organization." *Cornerstone*, 2005 U.S. Dist. LEXIS at \*21; *see also In re ESS Tech., Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 27203 (N.D. Cal. 2004). However, "where the pleading gives some basis for ascribing knowledge, participation or authorship, and/or control of the published information to an individual defendant" the doctrine may be applied. *Cornerstone*, 2005 U.S.Dist. LEXIS at \*22.

When dealing with allegations based on information and belief, and not plaintiff's personal knowledge, the PSLRA imposes further pleading requirements. "Allegations are deemed to be held on information and belief, and thus subject to the particularity requirements, unless plaintiffs have personal knowledge of the facts." *Cornerstone*, 2005 U.S.Dist. LEXIS at \*8 (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 n.3 (9th Cir. 2002)). Any allegation that is made on information and belief, must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "Naming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *Daou*, 411 F.3d at 1015 (citing *Nursing Home*, 380 F.3d at 1233). Therefore, to sufficiently plead falsity, a plaintiff must: (1) identify each alleged misstatement, and in the case of group published information, ascribe some authorship or control over the documents to the individual defendants; (2) state the reasons why the statement is misleading; and (3) in the case of confidential source information, supply an adequate factual basis to support the source's basis of knowledge with regard to the information provided. *See* 15 U.S.C. § 78u-4(b)(1).

With respect to scienter, the PSLRA also requires that the plaintiff "state with particularity facts

giving rise to a strong inference that the defendant[s] acted with the required state of mind" for each alleged act or omission. 15 U.S.C. § 78u-4(b)(2). "Deliberate recklessness" is the required state of mind and will satisfy scienter if it "reflects some degree of intentional or conscious misconduct." *Nursing Home*, 380 F.3d at 1230 (citing *Silicon Graphics*, 183 F.3d at 977). A complaint will not survive if it just relies on generic allegations. *See Silicon Graphics,* 183 F.3d at 974, 985. To assess whether a plaintiff has sufficiently pled scienter, a court must consider "whether the total of plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Nursing Home*, 380 F.3d at 1230.  Additionally, a court must consider "all reasonable inferences, whether or not favorable to the plaintiff." *Id.* (citing *Gompper*, 298 F.3d at 897).

## ANALYSIS

### I.      Defendants' Request for Judicial Notice

As a preliminary matter, the Court notes that Defendants have requested that the Court take judicial notice of the following documents, each of which is attached to the accompanying Declaration of Tiffany Harris-Sutton ("Harris-Sutton Declaration"):

(1)      Applied Signal's Form 10-K for FY03, filed on January 27, 2004;

(2)      Applied Signal's Form 10-Q for the second quarter of FY04, filed June 9, 2004;

(3)      Applied Signal's Form 10-Q for the third quarter of FY04, filed on September 9, 2004;

(4)      Applied Signal's Form 10-K for FY04, filed on January 14, 2005;

(5)      Applied Signal's Form 8-K, filed on August 26, 2004;

(6)      Applied Signal's Form 8-K, filed on December 23, 2004;

(7)      A chart listing the closing stock prices of Applied Signal during the Class Period;

(10)     A copy of 48 C.F.R. 52.242-15.

Pursuant to Federal Rule of Evidence Rule 201, documents that are alleged in a complaint and are essential to plaintiff's allegations may be judicially noticed. *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994); *Steckman v. Hart Brewing, Inc.* 143 F.3d 1293, 1295 (9th Cir. 1998).  A court may also

17

1    take judicial notice of "well-publicized stock prices" on a motion to dismiss. *Ganino v. Citizens Utilities*

2    *Co.*, 228 F.3d 154, 167 n.8 (2nd Cir. 2000).  Additionally, a court may take judicial notice of regulations

3    issued by federal agencies. *Citizens for a Better Env't-Cal. v. Union Oil Co.*, 861 F. Supp. 889, 897

4    (N.D. Cal. 1994) (citing *Mark v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir.

5    1986)).

6          Since Plaintiff does not oppose the taking of judicial notice of any of these documents, and since

7    judicial notice is proper, the Court hereby GRANTS Defendants' Request for Judicial Notice [Docket

8    No. 36].

9    **II.      Defendants' Motion to Dismiss**

10          In Defendants' Motion to Dismiss, Defendants argue that Plaintiff's Consolidated Amended

11   Complaint must be dismissed because: (1) the PSLRA's safe harbor provision precludes liability for any

12   of the purportedly false or misleading statements related to the Company's backlog; and (2) Plaintiff has

13   not stated, and cannot state, a cause of action under Section 10(b) of the Exchange Act or Rule 10b-5

14   for any of the allegedly false or misleading statements because the elements of falsity, scienter, and loss

15   causation are not supported by Plaintiff's allegations.  Since Defendants assert that no liability can be

16   established under Section 10(b) and Rule 10b-5, Defendants also argue that the Section 20(a) claim

17   against Yancey and Doyle must be dismissed.

18          **A.      The Safe Harbor Provision**

19          The first issue that must be addressed is whether the allegedly false and misleading statements

20   concerning the Company's backlog are rendered non-actionable because they are forward-looking

21   statements falling within the PSLRA's safe harbor provision.  The PSLRA carves out a safe harbor from

22   liability for forward-looking statements that prove false if the statement "is identified as a

23   forward-looking statement and is accompanied by meaningful cautionary statements identifying

24   important factors that could cause actual results to differ materially from those in the forward-looking

25   statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999). The

26   purpose behind this safe harbor is to encourage the disclosure of forward-looking information. *See* H.R.

27

28
                                                   18

United States District Court

For the Northern District of California

Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 53 (1995). Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss.  So long as the safe harbor requirements are met, liability cannot exist as a matter of law, regardless of the mind of the person making the statement. *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox,* 353 F.3d 1125, 1133 (9th Cir. 2004).

Forward-looking statements include statements containing a projection of revenues, income, or earnings per share, management's plans or objectives for future operations, or a prediction of future economic performance. 15 U.S.C. § 78u-5(i)(1)(A)-(C). In addition, any statement of "the assumptions underlying or relating to" these sorts of statements fall within the meaning of a forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(D).  A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made. *See Harris*, 182 F.3d at 805. Statements concerning historical or current facts are not forward-looking. *See Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga.1997); *In re Valujet, Inc. Sec. Litig.*, 984 F.Supp. 1472, 1479 (N.D. Ga. 1997).

With respect to statements regarding backlog, only four purportedly false and misleading statements are identified: (1) that the backlog as of the third quarter of FY04 was "[a]pproximately 11 million," made during the August 2004 Conference Call; (2) that the backlog at the end of the fourth quarter was about $143 million, made during the December 2004 Conference Call; (3) that the backlog at the end of the fourth quarter was $143 million, set forth in the December 2004 Press Release; and (4) that the backlog at fiscal year-end was $143 million, set forth in the FY04 Form 10-K.

The Court finds that each of these statements is a forward-looking statement that was accompanied by the appropriate cautionary language.  Specifically, for both the August 2004 Conference Call and the December 2004 Conference Call, Doyle stated the following:

> I'll review our financial performance, but let me begin with the obligatory safe harbor statement.  Our presentation today may contain forward-looking statements which reflect the Company's current judgment on future events. Because these statements deal with future events, they are subject to risks and uncertainties that could cause the actual results to differ materially. In addition to the factors that may be discussed in this call, important factors which could

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California

cause actual results to differ materially are contained in the Company's recent 10-Qs and 10-K.

*See* Harris-Sutton Decl. at Ex. C (August 24, 2004 Form 8-K); *see also id.* at Ex. F (December 21, 2004 Form 8-K) (stating same).

The Company's Form 10-Q filing, issued with respect to the previous quarter, provided the following additional cautionary language:

> Forward-looking statements may be identified by the use of terms such as "anticipates," "expects," "intends," "plans," "seeks," "estimates," "believes," and similar expressions, although some forward-looking statements are expressed differently. Statements concerning financial position, business strategy, and plans or objectives for future operations are forward-looking statements. These statements are not guarantees of future performance and are subject to certain risks, uncertainties, and assumptions that are difficult to predict and may cause actual results to differ materially from management's current expectations. Such risks and uncertainties include those set forth in this document under "Summary of Business Considerations and Certain Factors that May Affect Future Operating Results and/or Stock Price." The forward-looking statements in this report speak only as of the time they are made and do not necessarily reflect management's outlook at any other point in time. We undertake no obligation to update publicly any forward-looking statements, whether as a result of new information, future events, or for any other reason. However, readers should carefully review the risk factors set forth in other reports or documents we file from time to time with the Securities and Exchange Commission (SEC).

*See* Harris-Sutton Decl. at Ex. B.[8]

In the section entitled "Summary of Business Considerations and Certain Factors that May Affect Future Operating Results and/or Stock Price," the Company also noted that Applied Signal "depend[s] on revenues from a few significant contracts, and any loss, cancellation, reduction, or delay in these contracts could harm our business." *Id.*

Additionally, the Form 10-Q for the third quarter of FY04, which was filed on September 9, 2004, specifically stated:

> ***Stop-work orders could negatively impact our operating results and financial condition.*** Almost all of our contracts contain stop-work clauses that permit the other contracting party, at any time, by written order, to stop work on all or any part of the work called for by the contract for a period of ninety days. Within the ninety-day period, the other contracting party may cancel the

---

[8]This same language was set forth in the FY04 Form 10-K. *See id.* at Ex. H.

1

2

3

4

5

> stop-work order and resume work or terminate all or part of the work covered
> by the stop-work order. During June 2004, we received a stop-work order
> instructing us to stop work on a portion of our largest single contract. In
> accordance with the instructions received from the other contracting party, we
> prepared a proposal that detailed the tasks that were stopped and estimated the
> reduction in contract costs. If all the stopped tasks are terminated, the result
> could be a significant reduction in orders and backlog in the period in which it
> occurs. There can be no assurance that stop-work orders will not be received
> in future periods.

6   *See* Harris-Sutton Decl. at Ex. E (emphasis in original).

7       Further, the December 2004 Press Release included the following language:

8

9

10

11

12

13

14

15

16

17

18

19

> Except for historical information contained herein, matters discussed in this
> news release may contain forward-looking statements that involve risks and
> uncertainties that could cause actual results to differ materially.
> Forward-looking statements discussed in this release include statements as to
> the Company's continued growth throughout the year and into the foreseeable
> future; the future spending by the U.S. Government on intelligence gathering;
> the Company's ability to hire qualified personnel and such personnel's ability
> to obtain security clearances; the Company's plans for the future, including the
> steps it may take and the programs it will emphasize; the Company's beliefs
> concerning marketplace opportunities for its products and services; and beliefs
> concerning contractual opportunities for orders. The risks and uncertainties
> associated with these statements include whether orders will be issued by
> procurers, including the U. S. Government; the timing of any orders placed by
> procurers; whether the Company will be successful in obtaining contracts for
> these orders if they are forthcoming; whether any contracts obtained by the
> Company will be profitable and whether any such contracts might be
> terminated prior to completion; whether the Company will be able to hire
> additional qualified staff as needed; the ability to successfully enter new
> marketplaces; the Company's ability to maintain profitability; and other risks
> detailed from time to time in the Company's SEC reports including its latest
> Form 10-K filed for the fiscal year ended October 31, 2003. The Company
> assumes no obligation to update the information provided in this news release.

20   *See id.* at Ex. F (December 21, 2004 Form 8-K).

21       Plaintiff does not dispute that these cautionary statements were made, but attempts to dismiss

22   the language as mere "boilerplate" language, devoid of any meaning.  In the context of this litigation,

23   however, Plaintiff's argument is unavailing.  Indeed, *in addition to all of the disclosures set forth above*,

24   the Company consistently described the contingent nature of the Company's backlog figures in all of

25   its public filings.  For example, the following statement was set forth in the FY03 Form 10-K *and thus*

26   *preceded all of the aforementioned cautionary language*:

27

28

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

> Our **backlog** . . . **consists of anticipated revenues** from the uncompleted portions of existing contracts[.] . . . Anticipated revenues included in backlog may be realized over a multi-year period. We include a contract in backlog when the contract is signed by us and by our customer. We believe the backlog figures are firm, subject only to the cancellation and modification provisions contained in our contracts. (See Item 7: "Management's Discussion and Analysis of Financial Condition and Results of Operations–Backlog.") **Because of possible future changes in delivery schedules and cancellations of orders, backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period, and actual sales for the year may not meet or exceed the backlog represented. We may experience significant contract cancellations that were previously booked and included in backlog.**

8 *See* Harris-Sutton Decl. at Ex. A (FY03 Form 10-K) (emphasis added).    Given the complete and

9 thorough nature of the Company's disclosures regarding the unique structure of its business model, and

10 the attendant risks, Plaintiff's bare and unsupported conclusion that the Company's cautionary statements

11 "lacked meaning" is completely disingenuous.

12      Plaintiff's alternative argument that the allegedly false and misleading statements do not qualify

13 for safe harbor protection because the statements were not, in fact, forward-looking is equally without

14 merit.  Indeed, for the Court to accept Plaintiff's argument, it would have to completely ignore the fact

15 that Plaintiff's Consolidated Amended Complaint expressly identifies the allegedly false and misleading

16 statements *as statements concerning the Company's backlog. See, e.g.,* CAC at ¶ 29 ("The amounts

17 reported as 'backlog' by the Defendants on August 24, 2004 . . . were materially false and misleading

18 because the Defendants failed to disclose that the Company had received a 'stop-work order' in June

19 2004") and ¶ 35 ("The amounts reported as 'backlog' by the Defendants on December 21, 2004, and

20 January 14, 2005, . . . were materially false and misleading").  The Court would also have to ignore the

21 fact that Plaintiff admits, in the Consolidated Amended Complaint, that it was widely understood that

22 the term "backlog" relates to ***future*** revenues.  *See, e.g.,* CAC at ¶ 26.  Thus, according to Plaintiff's *own*

23 allegations, which are based on Plaintiff's *own* information and belief, the Company's backlog is, by

24 definition, merely a  "projection of revenue" or a "prediction of future economic performance," thus

25 falling squarely within the safe harbor. *See* 15 U.S.C. § 78u-5(i)(1)(A)-(C).  *Id.* at ¶ 26.

26      Further, contrary to Plaintiff's current assertion, the fact that the Company used the word "firm"

27
28                                          22

United States District Court

For the Northern District of California

1   to describe its backlog figures in the FY03 Form 10-K is not sufficient to equate the Company's

2   "backlog" with "historical data," such as the Company's actual, recognized quarterly revenue.[9]  Indeed,

3   even the passage in the FY03 Form 10-K that Plaintiff relies on makes clear that "backlog at any

4   particular date is not necessarily representative of actual sales to be expected for any succeeding period,

5   and actual sales for the year may not meet or exceed the backlog represented."  *See* Harris-Sutton Decl.

6   at Ex. A.   Additionally, the Company's quarterly filings continuously reiterated the fact that the

7   "backlog" consisted of the *uncompleted* portions of existing contracts.

8          Finally, Plaintiff's argument that the safe harbor is inapplicable because the Company did not

9   adequately inform investors with regard to certain events in the "past"  – *i.e.* "that the government had

10  already issued 'stop-work orders,'" – is unpersuasive because it is premised on Plaintiff's own failure to

11  understand the inherently contingent nature of a stop-work order.  Indeed, Plaintiff's entire securities

12  fraud theory relating to backlog is based on Plaintiff's belief that "the receipt of a 'stop-work order'

13  means that any previously reported 'backlog' amounts attributable to revenue within the scope of the

14  'stop-work' order are no longer valid."  *See* CAC at ¶ 26.  However, this statement is not supported by

15  the applicable regulations or the Company's actual manner of accounting for its backlog.  *See* 48 C.F.R.

16  52.242-15 (describing how the receipt of a stop-work begins the negotiation process and how a stop-

17  work order is subject to cancellation at any time during this negotiation period); *see also* Harris-Sutton

18  Decl. at Ex. E (Third Quarter FY04 Form 10-Q) (stating that the Company's backlog would not be

19  reduced until the negotiations relating to SW01 were completed and the Company was able to ascertain

20  whether parts of the applicable contract would actually be terminated).  Even under the lenient pleading

21  standard afforded to a plaintiff on a 12(b)(6) motion, this Court "need not accept as true allegations that

22  contradict facts which may be judicially noticed."  *Mullis v. United States Bankruptcy Ct.*, 828 F.2d

23  1385, 1388 (9th Cir.1987), *cert. denied*, 486 U.S. 1040 (1988).   Accordingly, Defendants have

24

25        [9]This is a distinction with a *significant* difference in the context of a publicly traded company.
    *See, e.g.,* Release No. SAB - 101, 1999 WL 1100908 (SEC bulletin providing guidance with respect to
26  revenue recognition). Ironically, had the Company actually characterized its potential revenue as "real"
    revenue in the manner that Plaintiff suggests is appropriate, the ramifications under the applicable SEC
27  rules and regulations would have likely been catastrophic.

28
                                                        23

persuasively shown that the safe harbor precludes liability for all of the allegedly false and misleading statements relating to the Company's backlog. Therefore, Plaintiff's claims pertaining to the backlog are hereby DISMISSED WITH PREJUDICE.

**B.      Plaintiff's Failure to State a Claim under Section 10(b) of the Exchange Act or Rule 10b-5**

Additionally, Defendants have also shown that Plaintiff has not stated a claim under Section 10(b) the Exchange Act or Rule 10b-5 with respect to *both*: (1) the allegedly false and misleading statements pertaining to the Company's backlog; and (2) the allegedly false and misleading statements pertaining to the Company's hiring of personnel. The sufficiency of Plaintiff's claims regarding the Company's backlog will be discussed first.

**1.      Statements Regarding the Company's Backlog**

**a.      The False and/or Misleading Element**

As noted in the previous discussion of the safe harbor provision, *supra*, Plaintiff's Consolidated Amended Complaint is premised on the following four allegedly false and/or misleading statements concerning the Company's backlog: (1) the August 2004 Conference Call; (2) the December 2004 Conference Call; (3) the December 2004 Press Release; and (4) the FY04 Form 10-K. Plaintiff alleges that the statement concerning the Company's backlog made during the August 2004 Conference Call was materially false and/or misleading because Defendants failed to disclose that, prior to the time the call took place, the Company had received two stop-work orders, SWO1 and SWO2. Plaintiff alleges that statements concerning the Company's backlog made during the December 2004 Conference Call, the December 2004 Press Release, and the FY04 Form 10-K were materially false and/or misleading because Defendants failed to disclose that, at the time the statements were made, the Company had received SWO2, SWO3, and SWO4.

As an initial matter, the Court notes that Plaintiff has not alleged any facts sufficient to show that any of the statements concerning the Company's backlog were actually false when made. Indeed, the theory set forth in Plaintiff's Consolidated Amended Complaint is that: (1) the statement made in August 2004 regarding the $111 million backlog was false because the $111 million backlog figure did not

24

**United States District Court**
For the Northern District of California

account for SWO1 and SWO2; (2) the statements made in December 2004 and January 2005 regarding the $143 million backlog was false because the $143 million backlog figure did not account for SWO2, SWO3, or SWO4.  However, the Company's public statements make clear that anticipated revenues are not "debooked" from the total backlog figure until the contract affected by the stop-work order is *actually terminated*.  *See* Harris-Sutton Decl. at Ex. E (Third Quarter FY04 Form 10-Q) (confirming that the backlog for the third quarter of FY04 was $111 million, but indicating that it might be reduced in FY05 *if* the "stopped tasks are [actually] terminated.").

For example, during the December 2004 Conference Call, an analyst specifically asked whether the $143 million included any potential "debookings," and Yancey replied as follows:

Q:   And does the – one more question for you, or two more questions, please.  Does the $143 million include – is that net of any potential debooking?

A:   That includes the $12 million that has not been debooked.

Q:   So it's not net of ***any*** potential debooking?  Includes?

A:   That's right.

*See* Harris-Sutton Decl. at Ex. F (December 2004 Form 8-K) (emphasis added).

Again, on February 22, 2005, Yancey responded to the following questions regarding backlog:

Q:   Okay. During the last quarter, you had a nice — Q4 of 2004 was a big bookings quarter and also backlog came in pretty robust. Can you give us an idea of where your backlog is right now?

A:   Sure, at the end of the first quarter, Jay, it's a little over $124 million.

Q:   And that is not net of any potential debooking, correct?

A:   Well, that's correct.

A:   Yes. We had to — we had to figure out how many negatives was in there, but you're correct. You're correct.

A:   So it still includes the $12 million — the 11 to 13 million in that range — $12 million of anticipated debooking.

*See* SEC Form 8-K, filed on February 22, 2005, at Ex. 99.2 (transcript of February 22, 2005 Conference Call).

United States District Court

For the Northern District of California

Thus, with respect to SWO2, SWO3, and SWO4,[10] Plaintiff would have to prove *both*: (1) that the stop-work orders actually resulted in a termination of all or a portion of the relevant contracts; and (2) that the effect of the termination was immediately calculable in the third or fourth quarters of FY04 or the first quarter of FY05.   Even construed in the light most favorable to Plaintiff, Plaintiff's Consolidated Amended Complaint does not contain any allegations sufficient to meet these requirements.

Additionally, in order for Plaintiff to prove that Defendants' statements were *misleading*, Plaintiff would have to show that the Company had a duty to disclose  SWO1 prior to September 9, 2004; that the Company had a duty to disclose SWO2 during the August 2004 Conference Call or thereafter; and that the Company had a duty to disclose SWO3 and SWO4 as of the time of the December 2004 Conference Call or thereafter.  *See Gallagher v. Abbott Labs., Inc.*, 269 F.3d 806, 809 (7th Cir. 2001) ("Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession. Yet that is not the way the securities laws work. We do not have a system of continuous disclosure. Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose.").  As Defendants point out, however, Plaintiff has not affirmatively alleged such duty, and it clear to the Court, based on the applicable facts and the law that has been presented, that no such duty existed.  For example, as to the pertinent facts, the allegations in the Consolidated Amended Complaint are ambiguous, at best, as to the: (1) dates the stop-work orders were issued; (2) the dates the stop-work orders were to expire; (3) whether the stop-work orders affected all or part of the relevant contracts; (4) whether the stop-work orders were subject to any extensions; (5) whether the stop-work orders actually resulted in any contract terminations; and (6) the amount of future revenues affected by the contract terminations, if such terminations occurred.

---

[10]Plaintiff's argument that the August 2004 Conference Call statement was false is foreclosed by the fact that Plaintiff admits that the statement that backlog was "approximately $111 million" was, in fact, correct.  *See* CAC at ¶ 29(a) ("The Third Quarter Form 10-Q reported the same 'backlog' number that the Defendants had announced in the August Conference Call.").

1    Further, in his opposition, Plaintiff does not identify a single statute or regulation that requires

2    a company to disclose either the *possibility* that contracts with customers may be terminated or the

3    actual termination of the customer contract.   Indeed, as Defendants aptly note, although the SEC

4    considered proposing such a regulation, it ultimately decided against it.   *See* SEC, Final Rule:

5    Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date, Release Nos. 33-8400,

6    34-49424 (Mar. 16, 2004) (declining to adopt Proposed Item 1.03, "Termination or Reduction of a

7    Business Relationship with a Customer.").   Where, as here, a plaintiff's complaint is devoid of the

8    pertinent details and fails to otherwise affirmatively plead the basis for the duty of disclosure, the Court

9    must dismiss the claim.   *See, e.g., In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n. 10 (3rd Cir.

10   2004).

11              **b.      Scienter**

12              Plaintiff's Consolidated Amended Complaint also fails to sufficiently establish scienter.   Under

13   the PSLRA, Plaintiff must allege particular facts giving rise to a *strong* inference of scienter.   15 U.S.C.

14   sec 78u-4(b)(2).   With respect to SWO1, the Consolidated Amended Complaint does not plead any facts

15   showing that the decision to disclose the stop-work order on September 9th, rather than August 24th,

16   was the product of fraud or even the product of recklessness.   In fact, the Consolidated Amended

17   Complaint does not say anything at all with regard to Doyle or Yancey's state of mind as of August 24,

18   2004, other than the conclusory assertion that Doyle and Yancey "did not deny" in the Form 10-Q that

19   they "knew about [SWO1] at the time that it was first issued by the government contractor."   *See* CAC

20   at ¶ 29(b).   Not only is this insufficient, but the fact that Defendants disclosed the SWO1 in the

21   Company's Form 10-Q *only two weeks later* cuts heavily against an inference of scienter.   *See, e.g., In*

22   *re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 170 (D. Mass. 2000).   The inference of scienter

23   is further negated by the fact that neither Yancey nor Doyle sold any stock during this two-week period.

24              With respect to SWO2, SWO3, and SWO4, the Consolidated Amended Complaint also fails to

25   set forth any allegations sufficient to show that Yancey or Doyle even knew of the stop-work orders,

26   much less that Yancey and Doyle deliberately attempted to deceive stockholders by providing false or

27

28                                                            27

United States District Court

For the Northern District of California

misleading information pertaining to the Company's backlog.  To the contrary, as noted previously, Yancey and Doyle candidly disclosed during the relevant period that potential debookings affecting future revenue were *not* excluded from the Company's backlog.  *See* Harris-Sutton Decl. at Ex. F (December 2004 Form 8-K).  The Company also repeatedly warned shareholders in its public filings that the Company's backlog was not necessarily representative of actual future sales or revenue.

Further, with respect to Doyle, there is no allegation that he sold any stock during the Class Period.  As to Yancey, it has not been sufficiently shown that his stock sales – which occurred during January 2005 – were "dramatically out of line with prior trading practices" or that they took place during a time specifically "calculated to maximize the personal benefit from undisclosed inside information."  *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).  To the contrary, the allegations in the Consolidated Amended Complaint plainly state that Yancey – like most of the other shareholders – sold stock after the Company announced fourth quarter operating results for FY04 that did not meet the analysts' expectations.  *See* CAC at ¶ 42 ("Only once in the preceding six months had more than 1 million shares of Applied Signal stock traded in a day; at no other time did volume exceed 600,000 shares in a day.").  The only allegation in the Consolidated Amended Complaint that even suggests an inference that the stock sales were suspicious is Plaintiff's bare assertion that "Yancey had complete knowledge of the 'stop-work orders' and their expected impact on the Company's revenues and earnings for the quarter."  *See* CAC at ¶ 49.  However, this assertion is completely undermined by the fact that Plaintiff's Consolidated Amended Complaint does not actually allege any ***facts*** showing that the stop-work orders had any impact on the Company's recognized revenue or earnings for the first quarter of FY05.  *See* CAC at ¶¶ 44-47.

### c.    Loss Causation

Finally, Defendants correctly argue that the Consolidated Amended Complaint does not provide an adequate basis for the required element of loss causation for SWO2, SWO3, or SWO4.[11]  Indeed, the

---

[11]Defendants concede in their Motion that loss causation relating to SWO1 is adequately plead.

**United States District Court**

For the Northern District of California

1     internal inconsistencies of the Consolidated Amended Complaint actually defeat a finding of loss

2     causation.  For example, as noted above, although Plaintiff's securities fraud theory is premised on his

3     contention that the Company's misleading statements regarding backlog resulted in substantial financial

4     loss to the shareholders, Plaintiff actually states, in his Consolidated Amended Complaint, that the price

5     per share of the Company's stock declined in December 2004 because the Company announced that: (1)

6     the earnings would only be 21 cents per share for the fourth quarter of FY04, as opposed to the analysts'

7     consensus estimate of 29 cents per share; and (2) the Company's revenue had only increased by 3%.

8     *See* CAC at ¶ 42.  Plaintiff also states that the price per share of the Company's stock declined in

9     February 2005 because the Company reported that "revenue declined almost 25 percent from the

10    preceding quarter, with net income and earnings per share declining as well."  *See* CAC at ¶ 44.

11          Although Plaintiff vigorously contends, in his Opposition brief, that the stop-work orders were

12    the actual cause of the losses in revenue, the Consolidated Amended Complaint *does not actually state*

13    *this*.  Indeed, the Consolidated Amended Complaint does not set forth *any* facts establishing a causal

14    connection between the contracts purportedly affected by the stop-work orders and the actual revenue

15    for the fourth quarter of FY04 or the first quarter of FY05.  Plaintiff's argument that it is "facially

16    absurd" to assume anything other than that SWO2, SWO3, and SWO4 directly impacted revenue in the

17    fourth quarter of FY04 and the first quarter of FY05 is undermined considerably by the relevant

18    government regulations concerning stop-work orders, which expressly provide that stop-work orders

19    are contingent for a ninety-day period and are otherwise subject to negotiations, revisions, and

20    extensions.  Plaintiff's argument is further undermined by the fact that contracts are included in the

21    "backlog" precisely *because* the revenue is not recognizable until the relevant portion of the contract

22    is completed and the fact that it is undisputed that anticipated revenues included in the backlog are

23    typically realized over a multi-year period.

24               **2.      Statements Concerning Hiring**

25          Next, with respect to Plaintiff's allegations concerning the Company's purportedly false and

26    misleading statements regarding the hiring of personnel, Defendants have effectively shown that

27

28                                                           29

United States District Court

For the Northern District of California

Plaintiff's Consolidated Amended Complaint fails to state a claim under Section 10(b) or Rule 10b-5. Over the course of the entire Class Period, only three statements concerning hiring are challenged in the Consolidated Amended Complaint: (1) two statement made during the August 2004 Conference Call; and (2) a statement made in the August 2004 Press Release.[12]

Plaintiff first challenges the fact that Yancey stated, during the August 2004 Conference Call, that he was "pleased that we've been able to stay up with a fairly aggressive growth requirement and, in particular, hiring of staff and staff that we can get cleared and hiring cleared staff and we believe that we're keeping our program performance on par with adequate performance to where we will continue to be looked upon as an asset to the defense community by the U.S. government." *See* Harris-Sutton Decl. at Ex. C.

The second August 2004 Conference Call statement challenged by Plaintiff is as follows:

> Q:            Okay.  Thank you.  Secondly, how many engineers did you add during the quarter?
>
> A (Doyle):    We've had total hiring of about 100 people year-to-date.  Let's see, I don't know Gary, what, about 30 through the quarter?
>
> A (Yancey):   I would have actually guessed maybe 20.  It slowed a bit into the summer, although perhaps not.  The simple answer would be to go ahead and use 30, Steve, and kind of assume we've been close to linear in our increase.

*See* Harris-Sutton Decl. at Ex. C.

As to the August 2004 Press Release, Plaintiff alleges that the following statement was false and misleading:

> Regarding the third quarter operating results, Mr. Gary Yancey, President and Chief Executive Officer of the Company, commented, "The greatly increased level of orders compared to fiscal 2003 has challenged us to meet aggressive hiring requirements and to control capital expenditures.  I am pleased that we have met these challenges and have been able to meet our contractual commitments.  This has resulted in our increase in revenue compared to fiscal 2003."

---

[12]The Consolidated Amended Complaint makes mention of other statements of similar nature made by Defendants, but these statements fall outside of the relevant Class Period.  *See* CAC at ¶ 38.

30

1    *See id.*

2                        **a.      The False and/or Misleading Element**

3           Plaintiff alleges that the aforementioned statements were materially false and misleading because

4    "[i]f Applied Signal had, in fact, added 100 employees 'year-to-date' as of August, 2004, as reported by

5    Defendant Doyle during the August Conference Call, the Company would have had 525 employees"

6    at the time of the December 2004 Conference Call and "should have had approximately 545 employees

7    at the end of the year."  *See* CAC at 40(b).  As an initial matter, given that Plaintiff's entire argument

8    is based on the fact that the Company had 498 employees in December instead of Plaintiff's *speculation*

9    that it *should* have had 525 or 545 employees, Plaintiff's claim borders on frivolous.  *See, e.g., Central*

10   *Laborers Pension Fund v. Merix Corp.*, 2005 WL 2244072, * 4 (D. Or. 2005) ("Plaintiff cannot meet

11   the heightened pleading standards applicable to fraud claims by simply characterizing Defendants'

12   statements, embedding in those characterizations assumptions not found in the statements themselves,

13   and then explaining why Plaintiff's own assumptions are false.").

14          Further, with respect to the element of falsity, Plaintiff's securities fraud "theory" is hopelessly

15   flawed.  First, as Defendants point out, the statement made by Doyle in the August 2004 Conference

16   Call makes clear that Doyle is not referring to a "net" gain of 100 employees.  Thus, a theory that

17   attempts to prove falsity by comparing Doyle's statement with the *total* number of employees within the

18   Company in December 2004 is inherently defective.  Indeed, there are no allegations in the Consolidated

19   Amended Complaint showing that the Company did not, in fact, hire the indicated number of

20   employees.  As such, Plaintiff has not adequately plead that the statements made by Doyle or Yancey

21   were false.  Second, and more importantly, Plaintiff utterly fails to show how Doyle and Yancey's

22   statements were misleading.  Indeed, it does not appear that Plaintiff could show this, as Doyle's and

23   Yancey's answers regarding hiring are replete with qualifiers such as "I don't know," "maybe," and "I

24   would have guessed."

25                        **b.      Scienter**

26          The fact that Doyle and Yancey expressly stated in the August 2004 Conference Call that they

27

28                                                                 31

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

were not expressing a firm opinion with regard to the exact number of employee hires, and were only guessing, also negates a finding that Doyle or Yancey acted out of deliberate recklessness or with an intent to defraud shareholders.  The inference of scienter is further negated by the fact that Doyle and Yancey did not experience any personal gain as a result of the allegedly false or misleading statements. Indeed, even Plaintiff admits that Yancey did not sell any Company stock until after the December 2004 disclosure which clarified the exact number of Company employees.

### c.      Loss Causation

Additionally, the Consolidated Amended Complaint does not establish a causal connection between the August 2004 statements regarding hiring and the December 2004 decline in stock price. To the contrary, as set forth previously, Plaintiff alleges, instead, that the stock price fell in December because the Company announced that it was not meeting the analysts' consensus estimate and because the Company's revenue only increased by 3%.  *See* CAC at ¶ 42.  Plaintiff's contention that the February 2005 decline in stock price is also attributable to the Company's August 2004 statements is foreclosed by the fact that Plaintiff admits that the investing public was apprised of the true number of employees in December 2004.

In sum, Plaintiff has failed to state claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Accordingly, these causes of action are hereby DISMISSED.

### C.      Liability Under § 20(a) of the Exchange Act

With respect to Plaintiff's second cause of action, to establish "control person" liability under Section 20(a) of the Exchange Act, Plaintiff must show that a primary violation of Section 10(b) or Rule 10b-5 was committed and that each individual defendant "directly or indirectly" controlled the violator. *See Paracor Finance, Inc. v. General Electric Capital*, 96 F.3d 1151, 1161 (9th Cir.1996).  Since Plaintiff has not stated a viable Section 10(b) or Rule 10b-5 claim, Plaintiff's claim under Section 20(a) of the Exchange Act necessarily fails.  Accordingly, the entire Consolidated Amended Complaint is DISMISSED.

### III.      Dismissal with Prejudice

32

1    Further, given the deficiencies in Plaintiff's Consolidated Amended Complaint identified herein,

2    the Court has concluded that it is appropriate to DISMISS the Consolidated Amended Complaint WITH

3    PREJUDICE.  In making this determination, the Court finds it important to point out that this case

4    departs from the usual circumstances where dismissal with leave to amend is appropriate because the

5    plaintiff has merely failed to allege, with *sufficient particularity*, facts supporting a viable legal theory

6    of securities fraud.  In this case, by way of contrast, the Consolidated Amended Complaint is defective

7    because Plaintiff's *theory* of fraud, itself, is legally flawed and is premised on either a fundamental

8    misunderstanding of Applied Signal's business model, at best, or a blatant misrepresentation of the

9    pertinent facts.  Since Plaintiff could only amend his Consolidated Amended Complaint to allege

10   additional facts that are *consistent* with the facts that have already been plead, the Court finds that

11   granting Plaintiff leave to amend in order to augment the Consolidated Amended Complaint with

12   additional facts would be futile.  Further, since Plaintiff has already changed his theory of fraud twice,[13]

13   granting further leave to amend would be highly prejudicial to Defendants.  The typically liberal

14   standard of allowing leave to amend should not be employed to require Defendants to defend against

15   an amorphous, "moving target" securities fraud case that is not well thought-out or well supported.

16   Further, the Court finds that dismissal without leave to amend is also appropriate given the

17   length of time that has passed since the initial complaint was filed.  Indeed, the initial complaint was

18   filed on March 11, 2005 and the Consolidated Amended Complaint was filed five months later, on

19   August 12, 2005.  Plaintiff has been on notice with regard to the defects of his Consolidated Amended

20   Complaint since September 14, 2005, when Defendants filed the instant Motion to Dismiss.

21   Accordingly, dismissal with prejudice is warranted on this basis as well.  *See  Lipton v. Pathogenesis*

22   *Corp.*, 284 F.3d 1027, 1038-39 (9th Cir. 2002) (affirming district court's dismissal with prejudice after

23   finding that: (1) more than six months had elapsed between the filing of the original lawsuit and the

24   filing of the consolidated amended complaint, and (2) three additional months had passed between the

26   [13]As noted in the discussion of the procedural history of this case, the complaints initially filed
27   set forth a different class period and were not expressly premised on the statements concerning the
     Company's stop-work orders and backlog.

28                                                      33

1   time the defendants filed their motion to dismiss and the district court's ruling).[14]

2   **<u>CONCLUSION</u>**

3       For all of the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' Motion

4   to Dismiss [Docket No. 35] is GRANTED.  The Court hereby DISMISSES the Consolidated Amended

5   Complaint WITH PREJUDICE.

6       IT IS FURTHER ORDERED THAT Defendant's Request for Judicial Notice [Docket No. 36]

7   is GRANTED.

8       IT IS FURTHER ORDERED THAT Plaintiff's Motion for Class Certification [Docket No. 25]

9   is DENIED AS MOOT.

10       IT IS SO ORDERED.

11

12   Dated: 2/6/06                   _____

                                    SAUNDRA BROWN ARMSTRONG

13                                     United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25 _____

26       [14]Further, the Court cannot overlook the fact that Applied Signal is currently in its 2006 fiscal

27   year, and yet Plaintiff's Opposition does not even *suggest* that Plaintiff is aware of any additional facts or events that have occurred during this passage of time that would lend further support to his case.

28

34