1   JEFFREY S. NOBEL (*jnobel@izardnobel.com*)
    MARK P. KINDALL (Bar #138703) (*mkindall@izardnobel.com*)
2   **IZARD NOBEL LLP**
    29 South Main Street, Suite 215
3   West Hartford, CT  06107
    Tel: (860) 493-6292 | Fax:  (860) 493-6290
4
    Lead Counsel for Lead Plaintiff
5
    ALAN R. PLUTZIK (Bar #077785) (*APlutzik@ bramsonplutzik.com*)
6   **BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP**
    2125 Oak Grove Road, Suite 120
7   Walnut Creek,  CA 94598
    Tel:  (925) 945-0200
8
    Liaison Counsel for Lead Plaintiff
9
10                        **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

11  | IN RE APPLIED SIGNAL | MASTER FILE NO. C 05-1027 (SBA) |
12  | TECHNOLOGY, INC. SECURITIES | |
    | LITIGATION | CLASS ACTION |
13  | | |
    | | **MEMORANDUM OF POINTS AND** |
14  | | **AUTHORITIES IN SUPPORT OF MOTION** |
    | | **FOR FINAL APPROVAL OF CLASS** |
15  | | **ACTION SETTLEMENT AND** |
    | | **APPLICATION FOR AWARD OF** |
16  | | **ATTORNEYS' FEES AND** |
    | | **REIMBURSEMENT OF COSTS AND** |
17  | | **EXPENSES** |

18                                          Date:    July 28, 2009
                                            Time:    1:00 p.m.
19                                          Place:   Courtroom 3
                                            Before:  Honorable Saundra Brown Armstrong
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION...............................................................................................1

II.   FACTUAL BACKGROUND..............................................................................2

    A.   History of the Litigation............................................................................3

III.  ARGUMENT.....................................................................................................5

    A.   THE SETTLEMENT MERITS FINAL APPROVAL...........................5

        1.   The Strength of Plaintiffs' Case.....................................................6

            a.   Establishing Liability and Damages in Connection With the "Backlog" Reported on August 24, 2004 .....................................7

            b.   Establishing Liability and Damages in Connection With the Alleged Non-Disclosure of Other "Stop-Work Orders"................9

        2.   The Risk, Expense, and Likely Duration of Further Litigation....................11

        3.   The Extent Of Discovery And The Stage Of The Proceedings..................12

        4.   The Amount Of The Settlement.....................................................12

        5.   The Experience and Views of Counsel..........................................13

        6.   The Risk of Maintaining Class Action Status Throughout The Trial.........14

        7.   The Reaction of Class Members to the Proposed Settlement.....................14

    B.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE.........................14

    C.   THE FEE AND EXPENSE APPLICATION SHOULD BE GRANTED..............15

        1.   Plaintiff's Counsel Are Entitled To A Fee Award Calculated As A Reasonable Percentage Of The Settlement In Common Fund Cases.........15

        2.   Evaluation of the Relevant Factors Weigh in Favor of the Fee Requested by Plaintiffs' Counsel..................................................16

            a.   The Requested Attorneys' Fees Are Well-Within The Range Of Attorneys' Fees Awarded In Similar Cases...............16

            b.   The Results Achieved When Viewed In Light Of The Litigation Risks...........................................................................17

            c.   The Effort, Experience and Skill of Class Counsel........................18

            d.   The Novelty, Difficulty and Complexity of the Issues..................18

            e.   The Reaction o The Settlement Class To The Requested Fees.......19

            f.   Lodestar Comparison......................................................................19

        3.   Plaintiff's Counsel's Costs and Expenses Were Reasonable....................20

        4.   An Award to the Lead Plaintiff Is Appropriate.............................................21

IV.   CERTIFICATION OF THE SETTLEMENT CLASS IS PROPER....................21

    A.   The Requirements Of Rule 23(a) Have Been Met.................................22

    B.   The Requirements Of Rule 23(b)(3) Have Been Satisfied....................23

V.    CONCLUSION................................................................................................25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF COSTS AND EXPENSES
MASTER FILE NO. C 05-1027 (SBA)

1

# TABLE OF AUTHORITIES

2

### *Cases*

3

*Amchem Prods. v. Windsor,*
    521 U.S. 591(1997)..........................................................................................24

4

*Anixter v. Home-Stake Prod.,*
5
    77 F.3d 1215 (10th Cir. 1996)........................................................................12

6
*Bateman Eichler, Hill Richards, Inc. v. Berner,*
    472 U.S. 299 (1985).......................................................................................16

7

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
8
    603 F.2d 263 (2d Cir. 1979),.........................................................................12
9
    444 U.S. 1093 (1980).....................................................................................12

10
*Berson v. Applied Signal Technology, Inc.,*
    527 F.3d 982 (9th Cir. 2008).........................................................................19
11

12
*Blackie v. Barrack*
    524 F.2d 891 (9th Cir. 1975)....................................................................23, 24

13

14
*Blum v. Stenson,*
    465 U.S. 886 (1984).......................................................................................16

15
*Boeing Co. v. Van Gemert,*
16
    442 U.S. 472 (1980).......................................................................................16

17
*Catogas v. Cyberonics, Inc.,*
    292 Fed.Appx. 311 (5th Cir. 2008)..................................................................9
18

19
*Class Plaintiffs v. Seattle,*
    955 F.2d 1268 (9th Cir. 1992); .................................................................5, 15

20
*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
21
    509 U.S. 579 (1993)...................................................................................10, 11

22
*Dura Pharmaceuticals v. Broudo,*
    544 U.S. 336 (2005)...............................................................................*passim.*
23

24
*Epstein v. MCA, Inc.,*
    50 F.3d 644 (9th Cir. 1995). .........................................................................24

25

26
*Gordon Partners v. Blumenthal,*
    No. 02 Civ. 7377(LAK) 2007 WL 1438753, (S.D.N.Y. May 16, 2007)................10

27

28

*Hanlon .v Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998)............................................................................6, 23

*Hanon v. Dataproducts Corp.,*
976 F.2d 497 (9th Cir. 1992)....................................................................................23

*Harris v. Marhoefer,*
24 F.3d 16 (9th Cir. 1994)........................................................................................21

*In re Activision Sec. Litig.,*
723 F.Supp. 1373 (N.D. Cal. 1989)..................................................................17, 20

*In re Adobe Systems, Inc. Sec. Litig.,*
139 F.R.D. 150 (N.D. Cal. 1991) ............................................................................22

*In re Apollo Group, Inc. Sec. Litig.,*
No. 04-2147 (D. Ariz. Aug. 4, 2008), .......................................................................9

*In re Cardinal Health, Inc. Sec. Litig.,*
528 F. Supp. 2d 752 (S.D. Ohio, 2007)............................................................13, 20

*In re CV Therapeutics, Inc. Sec. Litig.,*
2007 WL 1033478, (N.D. Cal. Apr. 4, 2007) ...................................................17, 21

*In re Emulex Sec. Litig.,*
210 F.R.D 717 (C.D. Cal. 2002)........................................................................22, 23

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
586 F. Supp. 2d 732 (S.D. Tex. 2008)...............................................................13, 20

*In re Equity Funding Corp. Sec. Litig.,*
438 F.Supp. 1303 (C.D. Cal. 1977)..........................................................................19

*In re First Virtual Communications, Inc. Sec. Litig.,*
No. 04-3585 (N.D. Cal. Sept. 18, 2007) .................................................................17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
55 F.3d 768 (3rd Cir. 1995)........................................................................................5

*In re Heritage Bond Litigation,*
2005 WL 1594403, (C.D. Cal. Jun. 10, 2005)......................................17, 18, 19, 20

*In re Mego Financial Corp. Sec. Litig.,*
213 F.3d 454 (9th Cir. 2000)..........................................................................6, 12, 17

iv

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
    No. 02 MDL 1484 2007 WL 313474, (S.D.N.Y. Feb. 1, 2007)..........................13

*In re NVIDIA Derivative Corp. Litig.,*
    No. 06-06110 (N.D. Cal.),...................................................................................5

*In re Pacific Enterprises Sec. Litig.,*
    47 F.3d 373 (9th Cir. 1995) ...............................................................................17

*In re Ravisent Technologies, Inc. Sec. Litig.,*
    No. 00-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005)....................................13

*In re Rite Aid Secs. Litig,*
    362 F.Supp. 2d 587 (E.D. Pa. 2005)....................................................................20

*In re Silicon Graphics, Inc. Sec. Litig.,*
    183 F.3d 970.........................................................................................................7

*In re Software Toolworks Sec. Litig.,*
    50 F.3d 615 (9th Cir. 1994)..................................................................................8

*In re THQ Sec. Litig.,*
    2002 WL 1832145 (C.D. Cal. Mar. 22, 2002)..................................................23, 24

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
    19 F.3d 1291 (9th Cir. 1994) ..............................................................................16

*In re Williams Sec. Litig.,*
    No. 02- 072, 2007 WL 2007987 (N.D. Okla. Jul. 6, 2007)..............................10, 11
    558 F.3rd 1130 (10th Cir. 2009)......................................................................10, 11

*In re Wireless Telephone Federal Cost Recovery Fees Litig.,*
    396 F.3d 922 (8th Cir. 2005)...............................................................................12

*Marshall v. Holiday Magic, Inc.,*
    550 F.2d 1173 (9th Cir. 1977)...............................................................................5

*National Rural Telecommunications Cooperative v. DIRECTV, Inc.,*
    221 F.R.D. 523 (C.D. Cal. 2004)....................................................................12, 14

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,*
    320 F.3d 920 (9th Cir. 1993) ................................................................................8

*Officers for Justice v. Civil Service Community of City and County of San Francisco,*
        688 F.2d 615 (9th Cir.1982)..........................................................................5, 6, 14

*Paul, Johnson, Alston & Hunt v. Graulty,*
        886 F.2d 268 (9th Cir. 1989).................................................................................16

*Phillips Petroleum Co. v. Shutts,*
        472 U.S. 797 (1985)................................................................................................24

*Robbins v. Koger Properties, Inc.,*
        116 F.3d 1441 (11th Cir. 1997)............................................................................12

*Rodriguez v. West Publishing Corp.,*
        563 F.3d 948.................................................................................................................6

*Santa Fe Indus., Inc. v. Green,*
        430 U.S. 462 (1977)..................................................................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
        551 U.S. 308, 127 S. Ct. 2499 (2007).....................................................................7

*Torrisi v. Tucson Elec. Power Co.,*
        8 F.3d 1370 (9th Cir. 1993)................................................................................6, 16

*Trans World Airlines, Inc. v. Hughes,*
        312 F. Supp. 478 (S.D.N.Y. 1970),.......................................................................12
        449 F.2d 51 (2d Cir. 1971), ..................................................................................12
        409 U.S. 363 (1973)................................................................................................12

*Vizcaino v. Microsoft Corp.,*
        290 F.3d 1043 (9th Cir. 2002)...............................................................................20

*Zhu v. The Fujitsu Group 401(k) Plan,*
        No. 03-1148, 2004 WL 3252573 (N.D. Cal. Mar. 3, 2004)...........................22, 23

*Zinser v. Accufix Research Institute,*
        253 F.3d 1180 (9th Cir. 2001).................................................................................24
        273 F.3d 1266 (9th Cir. 2001).................................................................................24

**STATUTES AND RULES**

15 U.S.C. § 78u-4(a)(4)...............................................................................................21

15 U.S.C. § 78u-4(b)(4)..................................................................................................8

vi

Rule 23(a) ................................................................................................................14, 22

Rule 23(a)(1)................................................................................................................22

Rule 23(a)(2)................................................................................................................23

Rule 23(a)(3)................................................................................................................23

Rule 23(a)(4)................................................................................................................23

Rule 23(b)(3)................................................................................................14, 22, 24

Rule 23(e)......................................................................................................................5

vii

## I.   INTRODUCTION

Lead Plaintiff Frank Whiting ("Plaintiff"), individually and on behalf of a class of purchasers of the common stock of Applied Signal Technology, Inc. ("Applied Signal") from August 25, 2004 to February 22, 2005, inclusive (the "Settlement Class"), submits this Memorandum in support of (i) Plaintiff's Motion for Final Approval of the $2,700,000 Class Action Settlement (the "Settlement")[1] between Plaintiff and Defendants (the "Approval Motion"),[2] (ii) the Application by Plaintiff's Counsel for Award of Attorneys' Fees and Reimbursement of Costs and Expenses (the "Fee and Expense Application"), and (iii) the Application for an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Lead Plaintiff Award Application").[3]

The Settlement should be approved as "fair, reasonable and adequate." The Settlement was the product of lengthy and contentious negotiations that were facilitated by an experienced mediator and former judge, provides the Settlement Class with an excellent recovery considering the significant risk that the Settlement Class would not recover any money in this litigation, and the substantial factual and legal hurdles that would have to be overcome in order to defeat a motion for summary judgment and prevail at trial. Additionally, the expense and delay of further litigation would have been substantial, with little likelihood of producing a better result.

The Fee and Expense Application should also be approved. Court-appointed Lead and Liaison Counsel ("Plaintiff's Counsel") respectfully request attorneys' fees equal to thirty percent of the Settlement Fund and reimbursement of $51,681.12 in litigation costs and expenses. The requested fees are reasonable and should be approved, as they are well within the range of fees awarded by courts in the Ninth Circuit, and are appropriate given the results achieved, the

---

[1]   The terms of the Settlement are set forth in a Stipulation of Settlement, executed by counsel for the parties on March 26, 2009 (the "Stipulation"). A copy of the Stipulation was previously filed with the Court as Exhibit A of the Joint Motion for Order Preliminarily Approving Settlement, Directing Notice, and Scheduling a Hearing Date, dated April 2, 2009 [Dkt. No. 87].

[2]   The Approval Motion has been filed simultaneously herewith. A [Proposed] Final Judgment of Dismissal, With Prejudice is attached as Exhibit A to the Approval Motion.

[3]   The Fee and Expense Application and the Lead Plaintiff Award Application have been filed with the Court simultaneously herewith. Each is accompanied by a [Proposed] Order.

1    substantial risks, the complexity of the issues, and the effort expended by Plaintiff's Counsel.

2    Finally, the Lead Plaintiff Award Application in the amount of $5,000.00 should be granted in

3    recognition of Plaintiff's significant time and effort in this Litigation.[4]

4        The reaction of the Settlement Class Members further confirms the reasonableness of the

5    Settlement and the requested fees and expenses. In accordance with the Court's May 22, 2009

6    Order Preliminarily Approving Settlement, Directing Notice, and Scheduling Hearing Date (the

7    "Preliminary Approval Order"), approximately 4,554 copies of the "Notice of Pendency of

8    Proposed Settlement of Class Action and Settlement Hearing" (the "Notice") were mailed to

9    Settlement Class Members or their representatives, and a Summary Notice was published in *The*

10    *Wall Street Journal*. *See* Nobel Declaration, ¶5; Affidavit of Mailing of Notice and Proof of

11    Claim, Publication of the Summary Notice and Receipt of Requests for Exclusion, dated July,

12    2009, by Francisco R. Garzon (the "Garzon Affidavit"), ¶¶ 4-9.[5] The Notice described the

13    Litigation, the Settlement (including the proposed Plan of Allocation), and stated that Plaintiff's

14    Counsel intended to apply for an award of attorneys' fees not to exceed 30% of the Settlement

15    Fund (plus interest), plus reimbursement of costs and expenses not to exceed $55,000, and an

16    award to Plaintiff. In accordance with the Preliminary Approval Order, the Notice also informed

17    Settlement Class Members of their right to object to the Settlement and the Fee and Expense

18    Application on or before July 14, 2009. No opposition to the Settlement or Fee and Expense

19    Application has been submitted to date. Nobel Declaration, ¶5.

20        For the reasons set forth below, the Court should approve the Settlement, the Fee and

21    Expense Application, and the Lead Plaintiff Award Application.

22

23

---

24    [4] In addition to this Memorandum, Plaintiff has submitted the Declaration of Jeffrey S. Nobel,
dated July 14, 2009 (the "Nobel Declaration"), which has been filed simultaneously herewith.
25    [5] The Nobel Declaration has been filed simultaneously herewith. The Garzon Affidavit is
26    submitted as Exhibit 1 to the Nobel Declaration in accordance with ¶12 of the Preliminary
Approval Order. The Notice, Proof of Claim, and Release, were also posted on the website of
27    Lead Counsel Izard Nobel LLP.

28                      2

## II. FACTUAL BACKGROUND

### A. History of the Litigation

The Litigation was commenced as a class action in March of 2005. By an Order dated July 13, 2005, the Court appointed Frank Whiting as Lead Plaintiff and approved Lead Plaintiff's selection of Schatz & Nobel, P.C. (now Izard Nobel LLP) as Lead Counsel. On August 12, 2005, Plaintiff filed a Consolidated Amended Class Action Complaint (the "Complaint"). The Complaint asserted claims against Defendants for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of the Settlement Class, and alleged, *inter alia,* that during the Settlement Class Period, Defendants issued false and misleading statements concerning the Company's "backlog" that artificially inflated the price of Applied Signal stock.

Following the filing of the Complaint, counsel for the parties participated in motion practice and discovery concerning class certification. On September 12, 2005, Plaintiff filed a Motion for Class Certification (the "Class Certification Motion"), and Defendants subsequently propounded discovery requests in connection with the Class Certification Motion. After responding to these discovery requests, Plaintiff submitted to a deposition by Defendants on November 3, 2005. Shortly thereafter, Defendants filed a pleading on November 10, 2005 which essentially acknowledged that the Class Certification Motion should be granted. [Dkt. No. 51].

The parties also participated in extensive motion practice concerning the sufficiency of the allegations in the Complaint. Defendants filed a Motion to Dismiss on September 14, 2005, which was fully briefed by November 14, 2005. *See* [Dkt. Nos. 35, 50, and 52]. On February 8, 2006, this Court dismissed the Complaint with prejudice, holding that (i) Defendants' statements concerning the amounts of the Company's backlog were not materially misleading as a matter of law, and were inactionable "forward-looking statements," (ii) the Complaint failed to properly allege that Defendants acted with scienter under the PSLRA, and (iii) the Complaint failed to properly allege "loss causation" under Section 10(b) of the Securities Exchange Act of 1934. [Dkt. No. 61]. The Court also denied the pending Motion for Class Certification as moot. *Id.*

3

1    Following the Court's dismissal of the Complaint, Plaintiff's Counsel then prosecuted an

2    appeal to the Ninth Circuit. A Notice of Appeal was filed on March 8, 2006, Plaintiff's Appellate

3    Brief was filed on June 15, 2006, Defendants' Appellate Brief was filed on August 28, 2006, and

4    Plaintiff's Reply Brief was filed on September 29, 2006. Oral argument was conducted before

5    the Ninth Circuit on December 6, 2007. On June 5, 2008, more than two years after this Court's

6    ruling, the Ninth Circuit reversed the dismissal of the Complaint. *Berson v. Applied Signal*

7    *Technology, Inc.,* 527 F.3d 982 (9th Cir. 2008).

8    Counsel for the parties then proceeded with the litigation and commenced discovery,

9    during which time Plaintiff's Counsel served a comprehensive request for production of

10   documents to Defendants, and a detailed questionnaire concerning the methods and practices used

11   by Applied Signal for storage and retention of electronic documents. The Parties also exchanged

12   initial disclosures of witnesses in mid-October 2008, and Defendants began a rolling production

13   of documents. Plaintiff's Counsel then immediately began the review and analysis of the internal

14   documents produced by Defendants.

15   Following the commencement of discovery, Defendants' counsel inquired as to whether

16   Plaintiff would be willing to participate in settlement negotiations. Plaintiff's Counsel responded

17   that it would be necessary to conduct document discovery before settlement discussions could

18   occur. Accordingly, Defendants accelerated the production of documents (which Plaintiff's

19   Counsel thoroughly reviewed), and the Parties engaged the services of an experienced mediator,

20   former Judge Daniel Weinstein.

21   Pursuant to Judge Weinstein's procedures, counsel for the parties next prepared (and

22   exchanged) extensive briefs setting out their respective positions concerning, *inter alia*, the

23   significance of the documents produced by Defendants, whether Plaintiff would be able to prove

24   that the alleged misrepresentations were materially false or misleading and made knowingly or

25   recklessly (*i.e.,* with scienter), whether Plaintiff would be able to prove that the Settlement Class

26   suffered damages, and, the size of potential damages to the Settlement Class, if any. On January

27   30, 2009, counsel for the parties participated in a full-day mediation session before Judge

28

4

1  Weinstein in New York City.  During the mediation, counsel for the parties made numerous

2  presentations and participated in vigorous debates concerning the factual and legal issues

3  described above.  Although the parties were unable to reach agreement during this mediation

4  session, settlement discussions continued through Judge Weinstein, which ultimately resulted in

5  an agreement in principle on February 20, 2009.

6  Counsel for the parties subsequently negotiated and documented the terms of the

7  Settlement, and executed the Stipulation on March 26, 2009.  As discussed above, on May 22,

8  2009, the Court preliminarily approved the Settlement, preliminarily certified the Settlement

9  Class, directed the dissemination of notice to that Settlement Class, and scheduled a final

10  hearing date for consideration of the Settlement, the Fee and Expense Application, and the Lead

11  Plaintiff Expense Application.

12  **III.    ARGUMENT**

13  ### A. THE SETTLEMENT MERITS FINAL APPROVAL

14  Strong judicial policy favors settlement of class actions.  *Class Plaintiffs v. City of Seattle,*

15  955 F.2d 1268, 1276 (9th Cir. 1992); *In re NVIDIA Derivative Corp. Litig.,* No. C-06-06110-SBA

16  (JCS), 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008).  Settlements are particularly favored

17  "in class actions and other complex cases where substantial judicial resources can be conserved

18  by avoiding formal litigation."  *NVIDIA,* 2008 WL 5382544, at *2 (quoting *In re GMC Pick-Up*

19  *Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir. 1995)).

20  Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of the

21  compromise of claims brought on a class basis.  The standard for determining whether to grant

22  final approval to a class action settlement is whether the proposed settlement is "fair, adequate,

23  and reasonable." *Officers for Justice,* 688 F.2d 615, 625 (9th Cir. 1992); *Marshall v. Holiday*

24  *Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir. 1977).  The Ninth Circuit has provided the following

25  framework for a court to determine whether a settlement is "fair, adequate, and reasonable" in a

26

27

28

5

1   class action:

2   > The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of class members to the proposed settlement.

3

4

5

6

7   *Officers for Justice,* 688 F.2d at 625; *see Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 963

8   (9th Cir. 2009); *In re Mego Financial Corp. Sec. Litig.,* 213 F.3d 454, 458-59 (9th Cir. 2000).

9   Not all of these factors will apply to every class action settlement; under certain circumstances,

10  one factor alone may prove determinative in finding sufficient grounds for court approval. *See,*

11  *e.g., Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir. 1993). The issue is not

12  whether the settlement could be better, but whether it is fair, reasonable, and adequate, and free

13  from collusion. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir. 1998).

14      As discussed below, the proposed Settlement is "fair, adequate, and reasonable" under the

15  standards articulated by the Ninth Circuit, and should be finally approved.

16              **1.    The Strength of Plaintiffs' Case**

17      The Settlement is fair and reasonable in light of the many hurdles Plaintiff would have to

18  overcome to defeat summary judgment and prove liability and damages. Liability under the

19  Exchange Act requires a plaintiff to prove, *inter alia,* that (i) Defendants made materially false or

20  misleading representations, (ii) Defendants acted with scienter (*i.e.,* that Defendants made their

21  misrepresentations knowingly or recklessly), (iii) that Plaintiff's losses were caused by

22  Defendants misrepresentations (i.e., "loss causation") and (iv) Plaintiff and the Class Members

23  suffered damages. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005). Failure

24  to prove just one of these elements would prevent *any* recovery.

25

26

27

28                                          6

### a. Establishing Liability and Damages in Connection With the "Backlog" Reported on August 24, 2004

The Settlement Class faced several challenges in proving liability and damages with respect to the Defendants' non-disclosure on August 24, 2004 that the Company had received a "stop-work order" concerning a significant portion of its largest contract when it reported the amount of its "backlog." *See* Complaint, ¶29. The first disclosure of this "stop-work" order occurred after the market closed on Thursday, September 9, 2004, when the Company filed its 10-Q Report with the SEC. The next day (September 10. 2004), the price of Applied Signal stock only declined by $0.07 – less than two tenths of 1 percent -- from $37.64 to $37.57. While the stock price dropped from $37.57 to $34.31 a few days later on September 13, 2004 (when one of the stock market analysts following Applied Signal issued a report which discussed the "stop work order"), establishing liability and damages with respect to Defendants' non-disclosure of this "stop-work order" would be difficult for several reasons.

First, a federal securities fraud claim requires proof that each defendant made misrepresentations with scienter – an "intent to deceive, manipulate or defraud." *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir. 1999). While the Ninth Circuit held that the Complaint adequately *pled* scienter with respect to Defendants' failure to disclose this "stop-work order" when Defendants reported the amount of the Company's "backlog" on August 24, 2004, Plaintiff's Counsel faced the real risk that they would not be able to convince a jury that Defendants acted with scienter by not disclosing the "stop-work order" when they reported backlog. Defendants could be expected to vigorously argue at trial that the evidence negated an inference that they acted with scienter when reporting backlog on August 24, 2004, because (i) Defendants had no *motive* to mislead, as they did not obtain any financial benefit from the sale of their stock holdings in the two-week period between August 24, 2004 and their subsequent disclosure on September 9, 2004 (*see, e.g, Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S. Ct. 2499, 2511 (2007) (while scienter can be established without such evidence, "personal financial gain may weigh heavily in favor of a scienter inference")) and (ii) as backlog is not a GAAP-defined term, and the receipt of a "stop-work order" does not necessarily result in

7

1    the loss of revenue on a contract included in backlog, the Defendants did not know that the

2    amount of reported backlog was rendered misleading due to the non-disclosure of the "stop-work

3    order.[6]

4         The stock price activity on September 10, 2004 also presented the real risk that Plaintiff

5    would be unable to prove that the non-disclosure of the first "stop-work order" was material

6    and/or caused losses and damages to the Settlement Class.  In this case, Plaintiff's ability to

7    demonstrate materiality is complicated by the fact that the stock did *not* appreciably decline in

8    price on Friday, September 10, 2004, after the 10-Q disclosed the existence of the first stop-work

9    order.  As the Ninth Circuit has observed:

> Stock price changes-or lack thereof-are also relevant to the
> determination of materiality. As the First and Third Circuits have
> recognized, the fact that a stock price does or does not change is
> interconnected with the materiality analysis in fraud-on-the-market
> cases. . . . . At a minimum, the static or dynamic nature of a stock
> price after the disclosure of previously withheld information is
> strong evidence of how reasonable investors view the significance
> of the information.

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,*
320 F.3d 920, 948 (9th Cir. 2003).

16        Even if Plaintiff could show that Defendants' non-disclosure of this "stop-work order" on

17   August 24, 2004 was material and caused the price of Applied Signal stock to be artificially

18   inflated, Plaintiff would still have to prove under *Dura* that subsequent decline in the price of the

19   stock on September 13, 2004 was caused by disclosures indicating that the August 24, 2004 press

20   release was false or misleading. 15 U.S.C. § 78u-4(b)(4).  Under *Dura,* a plaintiff cannot prove

21   "loss causation" through evidence that the misrepresentations merely caused the price of the stock

22   to be inflated; rather, he must prove that the losses were caused when the artificial inflation was

23   removed from the stock price as previously concealed facts were disclosed to the market which

---

25   [6]  While Plaintiff would argue to the jury that Defendants acted recklessly, a finding that
26   Defendants were only negligent would be insufficient to prove scienter. *See, e.g., Santa Fe Indus.,
     Inc. v. Green*, 430 U.S. 462, 490 (1977); *In re Software Toolworks Sec. Litig.,* 50 F.3d 615, 628-
27   629 (9th Cir.1994).

28                                                8

1   indicated that the defendant's prior statements were misleading. *Dura,* 544 U.S. at 346.

2   Defendants would be expected to vigorously argue that Settlement Class Members did not suffer

3   losses caused by the non-disclosure of the "stop-work order" on August 24, 2004 because (i) the

4   stock price failed to appreciably decrease on September 10, 2004 in response to the disclosure of

5   the "stop-work order" in the 10-Q Report and (ii) e the analyst's September 13, 2004 report

6   contained no *new* information about the "stop-work order." *See, e.g., In re Apollo Group, Inc.*

7   *Sec. Litig.,* No. CV 04-2147-PHX-JAT, 2008 WL 3072731, at *3 (D. Ariz. Aug. 4, 2008)

8   (analyst's reports did not constitute "corrective disclosures" because "they did not provide any

9   new, fraud-revealing analysis"); *Catogas v. Cyberonics, Inc.,* 292 Fed.Appx. 311 (5th Cir. 2008)

10   (disclosure of delisting decision, allegedly tied to the fraud, not "corrective disclosure" as it did

11   not reveal any new details about the fraud).  If Defendants' arguments were accepted, the

12   Settlement Class would not recover damages from these misrepresentations.

13          **b.**     **Establishing Liability and Damages in Connection With the Alleged Non-Disclosure of Other "Stop-Work Orders"**

14        The Complaint alleges that Defendants received additional "stop-work orders" during the

15   Settlement Class Period, that these "stop-work orders" were never disclosed, that the impact of

16   those "stop-work orders" caused Applied Signal to report disappointing financial results on

17   December 21, 2004 and February 22, 2005, and that the price of Applied Signal stock dropped

18   when the Company reported these disappointing financial results. Compl., ¶¶ 35, 42-45.  As

19   discussed below, the Settlement Class faced real risks in establishing liability and damages

20   arising out of the alleged non-disclosure of these other "stop-work orders."

21        For example, some of the documents produced in discovery provided grounds for

22   Defendants to argue that one of the "stop-work orders" alleged in the Complaint ("stop-work

23   order" number 3) involved a relatively small amount of work; if a jury were to accept these

24   arguments, then the jury could conclude that that non-disclosure of "stop-work order" number 3

25   did not render Applied Signal's reported backlog materially misleading and/or that Defendants'

26   non-disclosure was not intentional or reckless (i.e., with scienter).  Similarly, other documents

27   produced by Defendants arguably indicated that Applied Signal did not receive what was alleged

28            9

1   in the Complaint as "stop-work order" number 2; instead, the documents arguably indicated that

2   Applied Signal only received a directive from a client to temporarily delay certain work until

3   further testing on a particular project was completed; if a jury concluded that this "directive" did

4   not rise to the level of a "stop-work order," the jury could conclude that non-disclosure of this

5   "directive" did not render Applied Signal's reported backlog materially misleading and/or that

6   Defendants' non-disclosure of this "directive" was not undertaken with scienter.

7       If the case did not settle, Defendants could also be expected to attempt to introduce

8   evidence to advance their argument that the non-disclosure of these other "stop-work orders" did

9   not cause the losses and/or damages from the stock price drops in December 2004 and February

10  2005, within the meaning of *Dura*. Courts have ruled that proving that a stock price decline was

11  "caused by" the corrective disclosure, rather than extraneous factors, generally requires statistical

12  analysis.[7] Thus, to show that the Company's stock price drops were caused by the alleged

13  misrepresentations, Plaintiff would need to provide expert testimony, probably in the form of an

14  "event study" to "filter out" other potential causes of the stock's movement on days when

15  disclosures were made.[8] Here, for example, Defendants have argued that other factors were

16  responsible for Applied Signal's poor financial results, including a labor shortage that limited the

17  ─────────────

    [7] *See Gordon Partners v. Blumenthal*, No. 02 Civ. 7377(LAK), 2007 WL 1438753, *2 (S.D.N.Y.

18  May 16, 2007) (granting summary judgment for failure to provide a statistical "event study" or
    similar analysis to prove that loss was caused by defendants' conduct).

19  [8] The difficulties in doing so are illustrated by *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-
    FHM, 2007 WL 2007987 (N.D. Okla. July 6, 2007), where the court found that plaintiff's expert

20  failed to differentiate between "losses rooted in causes cognizable under loss causation doctrine,
    on one hand, and, on the other hand, losses attributable to industry-specific stresses, the meltdown

21  in the telecommunications sector, and other negative developments unrelated to the alleged
    fraud." 2007 WL 2007987, at *62, *aff'd*, 558 F.3d 1130, No. 07-5119, 2009 WL 388048 (10th

22  Cir. Feb. 18, 2009). In consequence, the *Williams* court found that it would be impossible, based

23  on the expert's testimony, to "ascribe some rough proportion of the whole loss to" defendants'
    misstatements. *Id.* Accordingly, this key evidence did not survive a challenge based on *Daubert*

24  *v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and without the evidence, the
    plaintiff was unable to survive defendants' summary judgment motion. *Williams*, 2007 WL

25  2007987. at *86-87. The Tenth Circuit affirmed, and specifically held that Plaintiff's expert had

26  failed to filter out other potential causes of the stock's decline. 583 F.3d at 1142 ("Dr. Nye's
    failure to show why the February 4 losses should be attributed to the revelation of fraud and not

27  other non-fraud related news renders his methodology unreliable.").

28                                              10

1    Company's ability to recognize revenue from existing contracts in the first quarter of Fiscal Year

2    2005 (the results for which were reported on February 22, 2005). Proving that "stop-work

3    orders" were a substantial factor in the poor results would have inevitably resulted in a "battle of

4    experts" as to whether it was possible to "isolate and remove" from each of the stock price drops

5    the amount of the decline that was caused by other factors, which could lead to an unfavorable

6    result for the Plaintiff.

7                    **2.     The Risk, Expense, and Likely Duration of Further Litigation**

8           The risk, expense and likely duration of the further litigation also support final approval of

9    the Settlement. As discussed above, Plaintiff and the Settlement Class face significant risks and

10   hurdles in order to prove liability and damages. In addition, without a settlement, the expense and

11   duration of the Litigation is certain to dramatically increase. Although Plaintiff's Counsel

12   conducted an extensive factual investigation before filing the Complaint, and has reviewed a large

13   number of internal documents, considerably more discovery would be required before the case

14   was trial-ready, including numerous depositions of fact and expert witnesses. Defendants would

15   likely file *Daubert* motions and a motion for summary judgment at the close of discovery.

16   Assuming that the Court were to deny summary judgment, a trial on the merits would be lengthy

17   and expensive, and would likely be followed by appeals. Appeals of rulings on summary

18   judgment or trial would certainly add years to this litigation, and at best, would materially delay

19   the time until the Settlement Class would receive any money. In addition, in complex cases such

20   as this, even a victory at trial is no guarantee of ultimate success, as an appeal could seriously and

21   adversely affect the size of the judgment, if not the judgment itself.[9] Thus, barring a settlement,

---

[9] *See, e.g., Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and ordering entire litigation dismissed in securities class action); *Anixter v. Home-Stake Prod.*, 77 F.3d 1215 (10th Cir. 1996) (1988 jury verdict in case initiated in 1973 overturned in 1996 on basis of 1994 Supreme Court opinion); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093 (1980) (multimillion dollar judgment reversed after 11 years of litigation and lengthy trial); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478 (S.D.N.Y. 1970), *modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363 (1973) ($145 million judgment overturned).

11

there is no question that this case would be litigated for years, taking a considerable amount of Court time and costing millions of additional dollars. Accordingly, this factor supports approval of the settlement.[10]

### 3.   The Extent Of Discovery And The Stage Of The Proceedings

After four years of litigation and an appeal to the Ninth Circuit, stage of the proceedings clearly supports final approval of the Settlement. The purpose of considering the extent of discovery and the stage of proceedings is to ensure that the litigants had access to sufficient information to evaluate the case and determine the adequacy of the proposed settlement. Plaintiff's Counsel has litigated this case for several years, conducted a significant factual investigation (including interviews with confidential witnesses), extensive document review, and consulted with an expert concerning the potential damages to the Settlement Class. Accordingly, Plaintiff's Counsel possessed sufficient information to make an informed decision about the Settlement. *See, e.g., In re Mego Financial Corp. Sec. Litig.,* 213 F.3d at 459.

### 4.   The Amount Of The Settlement

The size of the Settlement further demonstrates that it is fair, reasonable and adequate to the Settlement Class. Courts and commentators have observed that "[t]he typical recovery in most class actions generally is three-to-six cents on the dollar." *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 586 F. Supp. 2d 732, 804 (S.D. Tex. 2008) (citing *In re Cardinal Health, Inc. Sec. Litig.,* 528 F. Supp. 2d 752, 764 (S.D. Ohio, 2007) and Elaine Buckberg, *et al., Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements,*

---

[10] *See, e.g., National Rural Telecommunications Cooperative v. DIRECTV, Inc.,* 221 F.R.D. 558, 526 (C. D. Cal. 2004) ("The Court shall consider the vagaries of litigation and compare the significance of immediate recovery by way of compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, 'it has been held proper to take the bird in hand instead of a prospective flock in the bush.'") (citations and quotations omitted); *In re Wireless Telephone Federal Cost Recovery Fees Litig.,* 396 F.3d 922, 933 (8th Cir. 2005) ("barring settlement, this case would likely drag on for years, require the expenditure of millions of dollars, all the while class members would receive nothing") (internal citations and quotations omitted).

12

8 (NERA, Feb. 2005)).[11] Here, the Settlement provides members of the Settlement Class with a substantial recovery that is well in excess of typical recoveries, as the Settlement represents approximately 11 percent of Plaintiff's "best case" damages estimate of approximately $24.9 million in damages. Significantly, Plaintiff's "best case" damages estimate is based upon the assumption that, *inter alia*, Plaintiff's Counsel would be able to convince the Court and the jury that the stock drop on September 13, 2004 was caused by Defendants' non-disclosure of the "stop-work order" that was disclosed in the 10-Q that was filed on September 9, 2004 (which, as discussed above, arguably did not cause an appreciable stock drop on September 10, 2004); if the Court or the jury rejected Plaintiff's position that the September 13, 2004 stock drop was caused by the non-disclosure of the "stop-work order" on August 24, 2004, damages to the Settlement Class could be as low as $143,450. Given these factors, analysis of the amount of the Settlement further supports the reasonableness of the Settlement.

### 5.   The Experience and Views of Counsel

The experience and views of Plaintiff's Counsel favors approval of the Settlement. "'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.' This is because '[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's outcome in the litigation.'" *National Rural,* 221 F.R.D. at 528 (citations omitted). Plaintiff's Counsel, who have a great deal of experience in securities class action litigation, have weighed all of the above factors and have concluded that the Settlement is a favorable result which is in the best interests of the Settlement Class. Where, as here, settlement is reached through arm's-length

---

[11] *See also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* No. 02 MDL 1484 (JFK), 2007 WL 313474, * 10 (S.D.N.Y. Feb. 1, 2007) (recovery representing 6.25 percent of damages was "at the higher end of the range of reasonableness of recovery in class actions securities litigations") (citing Ellen M. Ryan & Laura E. Simmons, Cornerstone Research, *Post-Reform Act Securities Settlements: 2005 Review and Analysis,* at 5, *available at* http://www.businessforum.com/ Cornerstone_04.html)); *In re Ravisent Technologies, Inc. Sec. Litig.,* No. Civ. A.00-CV-1014, 2005 WL 906361, *9 (E.D. Pa. April 18, 2005) (since 1995, class settlements have typically recovered "between 5.5% and 6.2% of the class members' estimated losses").

13

negotiations between experienced counsel, and there is no evidence of collusion or bad faith, the judgment of counsel concerning the adequacy of the settlement is entitled to deference. *See, e.g., Officers for Justice,* 688 F.2d at 625; *National Rural Telecommunications Cooperative v. DIRECTV, Inc.,* 221 F.R.D. 523, 528 (C.D. Cal. 2004).

### 6.   The Risk of Maintaining Class Action Status Throughout The Trial

As discussed below, Plaintiff's Counsel believe the Court should certify the Settlement Class, as the requirements of Rule 23(a) and Rule 23(b)(3) are met. Accordingly, there is little risk that class action status would not be maintained throughout the trial.

### 7.   The Reaction of Class Members to the Proposed Settlement

The reaction of Settlement Class Members to the proposed Settlement further supports final approval. As discussed above, approximately 4,554 copies of the Notice were mailed to Settlement Class Members or their representatives and posted in the Internet, and a Summary Notice was published in *The Wall Street Journal. See* Nobel Declaration, ¶5; Garzon Affidavit, ¶¶4-9. Although the Notice provided that Settlement Class Members could object to the proposed Settlement by July 14, 2009, no objections to the Settlement have been submitted or expressed to Plaintiff's Counsel to date.

### B.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

Plaintiff also seeks final approval of the proposed Plan of Allocation of the Settlement proceeds. The Notice disseminated to Settlement Class Members describes the Plan of Allocation in detail. The evaluation of a plan of allocation, like the Settlement itself, is based upon whether the plan is fair and reasonable.[12] The Plan of Allocation here allocates losses based on an assessment by Plaintiff's Counsel of the damages that could have been recovered under the principles articulated in *Dura Pharmaceuticals v. Broudo,* 544 U.S. 336 (2005), in relation to the date(s) and price(s) of a Settlement Class Member's purchase(s) and sale(s) of Applied Signal stock. The Plan of Allocation should be approved as it will result in a fair and equitable

---

[12] *See Class Plaintiffs v. Seattle,* 955 F.2d 1268, 1284 (9th Cir. 1992); *In re Oracle Sec. Litig.,* 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994).

14

1    allocation of the Settlement proceeds based on *Dura*.

2          **C.     THE FEE AND EXPENSE APPLICATION SHOULD BE GRANTED**

3          Plaintiff's Counsel also respectfully requested that the Court grant the Fee and Expense

4    Application. The requested attorneys' fees are reasonable and should be approved, as they are

5    well within the range of fee awards approved by Courts in the Ninth Circuit, and are especially

6    appropriate when considered in relation to the impressive efforts of Plaintiff's Counsel, the

7    complexity of the issues, and the substantial litigation risks in this case. Moreover, as a matter of

8    public policy, lawyers should be encouraged to seek recovery for members of the public injured

9    in relatively "small" cases. Here, Plaintiff's Counsel vigorously prosecuted for four years a case

10   with "best case" damages of less than $25 million without any guarantee of payment, and, despite

11   numerous obstacles, including dismissal of the Complaint with prejudice, succeeded in securing a

12   substantial settlement for the Settlement Class. Plaintiffs' Counsel undertook this action on a

13   wholly contingent fee basis, making a substantial investment of their time and of their own

14   money with no guarantee of compensation. Unlike counsel for the Defendants (who are paid

15   substantial hourly rates, and reimbursed for their out-of-pocket expenses on a regular basis),

16   Plaintiffs' Counsel have not been compensated had they been unsuccessful in this action.

17   Accordingly, the amount requested as attorneys' fees is fair and reasonable under the

18   circumstances of this case.

19          **1.     Plaintiff's Counsel Are Entitled To A Fee Award Calculated As A
                      Reasonable Percentage Of The Settlement In Common Fund Cases**

20         When a representative plaintiff establishes a common fund for the benefit of the members

21   of a class, his attorneys are entitled to recover attorneys' fees and costs from the fund. *Boeing*

22   *Co. v. Van Gemert*, 442 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common

23   fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's

24   fee from the fund as a whole"). This rule, referred to as the "common fund doctrine," is firmly

25   rooted in American case law. *See, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268,

26   271 (9th Cir. 1989). The purpose of this doctrine is to avoid unjust enrichment so that "those who

27   benefit from the creation of the fund should share the wealth with the lawyers whose skill and

28                                                  15

1   effort helped create it." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th

2   Cir. 1994).[13]

3       A reasonable fee may be based on a percentage of the fund recovered for the class. *Blum*

4   *v. Stenson*, 465 U.S. 886, 900 n.16 (1984).  While a district court has discretion to award

5   attorneys' fees based on either the "lodestar/multiplier" (*see, e.g., In re Wash. Pub. Power*, 19

6   F.3d at 1296) or the percentage-of-the-fund method (*see, e.g., Paul, Johnson*, 886 F.2d at 268;

7   *Torrisi*, 8 F.3d at 1376-77), courts in the Ninth Circuit have almost uniformly used the percentage

8   method to award attorneys' fees in class actions.

9           **2.**      **Evaluation of the Relevant Factors Weigh in Favor of the Fee**
                            **Requested by Plaintiffs' Counsel**

10      For the following reasons, the requested attorneys' fees are fair and reasonable.

11
            **a.**      **The Requested Attorneys' Fees Are Well-Within The Range Of**
12                         **Attorneys' Fees Awarded In Similar Cases**

13      The percentage of the Settlement requested as attorneys' fees – thirty percent – is well

14  within the range of class action fees awarded by courts in the Ninth Circuit.. While the Ninth

15  Circuit has held that a fee award of 25% of the settlement fund is an appropriate starting point (or

16  "benchmark") for determining class action fees, that Court has affirmed, and district courts have

17  granted, awards of attorneys' fees at or above the 30% fee requested here. *See, e.g., In re Mego*

18  *Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) (affirming fee award of 33 1/3 % of fund); *In*

19  *re Pacific Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (award of 33% of settlement

20  fund as fees affirmed); *In re First Virtual Communications, Inc. Sec. Litig.*, No. C 04-3585 MJJ

21  (N.D. Cal. Sept. 18, 2007) (awarding attorneys' fees of 30% of the Settlement Fund) (attached as

22  Exhibit 5 to the Nobel Declaration); *In re CV Therapeutics, Inc. Sec. Litig.*, 2007 WL 1033478,

23  *1, No. C 03-3709 SI (N.D. Cal. Apr. 4, 2007) (awarding fees of 30% of the settlement fund on

24  the basis that 30% is "consistent with awards made in similar cases"); *In re Heritage Bond*

25  [13] The justification for compensating class counsel out of the class's recovery is particularly
26  strong in securities class actions, as private securities actions are "a most effective weapon in the
    enforcement" of the securities laws and are "a necessary supplement to [SEC] action." *Bateman*
27  *Eichler, Hill Richards, Inc. v, Berner*, 472 U.S. 299, 310 (1985) (citation omitted).

28  16

1  *Litigation,* 2005 WL 1594403, \*18-23 (C.D. Cal. June 10, 2005) (after noting that federal courts

2  consistently award fees of 30% or higher, Court awarded fees of 33 1/3% of settlement); *In re*

3  *Activision Sec. Litig.,* 723 F.Supp. 1373, 1378 (N.D. Cal. 1989) ("this court concludes that in

4  class action common fund cases the better practice is to set a percentage fee and that, absent

5  extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate

6  should be set at 30%").

7             **b.**      **The Results Achieved When Viewed In Light Of The Litigation Risks**

8         The percentage fee requested is fair and reasonable when the Settlement is evaluated in

9  relation to significant litigation risks faced by Plaintiff's Counsel.  As discussed above, Plaintiff's

10 Counsel faced the real risk that the Settlement Class would not be able to establish Defendants'

11 liability due to significant factual, legal and evidentiary hurdles, such as difficulties in proving

12 material misrepresentations, scienter, loss causation and damages.  In addition, as discussed

13 above, Plaintiff's relatively small "best case" damages estimate required the Court and the jury to

14 accept Plaintiff's argument that the stock price drop on September 13, 2004 was recoverable,

15 despite the fact that (i) the drop occurred days after the September 9, 2004 disclosure and (ii) the

16 September 10, 2004 stock drop was arguably insignificant.  Despite these difficulties, Plaintiff's

17 Counsel achieved a substantial settlement that is a substantial percentage of the maximum

18 damages that could be awarded after trial and all appeals if Plaintiff established liability on *all*

19 claims and was awarded damages for the *full* amount of all stock drops.  Moreover, Plaintiff's

20 Counsel – who first began their work on this case over four years ago – prosecuted this litigation

21 on a contingent-fee basis, expending substantial time and money with no certainty of recovery.

22 These litigation risks were substantially increased when this Court dismissed Plaintiff's

23 Complaint, with prejudice, and denied the then-pending Motion for Class Certification as moot.

24 Despite these substantial risks, Plaintiff's Counsel successfully prosecuted an appeal, revived the

25 claims, and achieved a favorable result for the Settlement Class that strongly supports the fees

26 requested.  Courts have consistently recognized that the result achieved through the efforts of

27 counsel in relation to the risks of the litigation and non-payment are important factors to be

28                                      17

1  considered in determining a fee award. *See e.g., In re Heritage Bond Litigation, supra,* 2005 WL

2  1594403,* 19-21.

3            **c.    The Effort, Experience and Skill of Class Counsel**

4        The effort, experience and skill of Plaintiff's Counsel also weighs in favor of approval of

5  the requested attorneys' fees. As discussed above, Plaintiff's Counsel expended significant effort

6  over the past four years in order to achieve the Settlement, including an extensive factual

7  investigation in connection with the Complaint, a multi-year prosecution of a successful appeal,

8  review and analysis of documents in discovery, and achieving the Settlement after a contentious

9  mediation. Moreover, as described in the firm resumes attached to the Nobel Declaration,

10  Plaintiff's Counsel have substantial expertise in complex class action litigation, which further

11  supports the reasonableness of the fees requested. *See, e.g., In re Heritage Bond Litigation,*

12  *supra,* 2005 WL 1594403,* 19 (experience of Plaintiff's Counsel justified 33% fee award).

13  Finally, the Litigation was made even more difficult by the quality and resources of Defendants'

14  counsel, lawyers from a skilled and highly respected law firm, which courts have relied upon as

15  another important factor in evaluating the reasonableness of requested attorneys' fees. *See, e.g.,*

16  *In re Equity Funding Corp. Sec. Litig.,* 438 F.Supp. 1303, 1337 (C.D. Cal. 1977).

17            **d.    The Novelty, Difficulty and Complexity of the Issues**

18        The novelty, difficulty and complexity of the issues in the case are also factors in

19  evaluating the fairness of the requested fee award. Securities class actions by their nature involve

20  complex and legal issues. *In re Heritage Bond Litigation, supra,* 2005 WL 1594403,*19 (the

21  "prosecution and management of a complex national class action requires unique legal skills and

22  abilities"). The prosecution of securities class actions has only become more difficult following

23  the passage of the PSLRA. *See, e.g., Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982,

24  983 (9th Cir. 2008).

25        The issues on appeal in this litigation demonstrate that this litigation involved especially

26  novel, difficult and complex questions concerning scienter, loss causation, the requirements for

27  properly alleging material misrepresentations under the PLSRA, and the proper application of the

28                          18

1   PSLRA's "safe harbor" for forward-looking statements.  Similarly, the viability of Plaintiff's

2   claims was dependent upon the resolution of an issue of first impression: whether a company's

3   public statements concerning the amount of its "backlog" may constitute an actionable

4   misrepresentation of present fact under the federal securities laws.  Moreover, as discussed above,

5   the success of Plaintiff's claims (and the size of potential damages) was ultimately dependent on

6   the resolution of complex evidentiary issues concerning the application of *Dura* and whether the

7   evidence would show that stock price drops were causally related to Defendants' non-disclosure

8   of "stop-work orders," which were made even more difficult by (i) the fact that a large stock price

9   drop did not occur on September 10, 2004, and the stock drop which formed the basis of the

10  damages claim (on September 13, 2004) occurred a few days after the September 9, 2004

11  disclosure and (ii) evidence which arguably infers that the poor financial results which

12  precipitated the two stock price drops (in December 2004 and February 2005) may have also been

13  caused by factors other than the non-disclosure of "stop work orders.  Thus the difficulty, novelty

14  and complexity of these issues clearly support the fairness of the fees requested.

15                         e.        **The Reaction of The Settlement Class To The Requested Fees**

16          The Notice disclosed that Plaintiff's Counsel would apply for an award of attorneys' fees

17  in an amount not to exceed 30% of the Settlement Fund.  To date, no Settlement Class Member

18  has objected, which also supports the reasonableness of the fees requested. *See, e.g., In re*

19  *Heritage Bond Litigation*, 2005 WL 1594403,* 21.

20                         f.        **Lodestar Comparison**

21          The requested attorneys' fees are also fair when considered in relation to the amount of

22  work performed by Plaintiff's Counsel.  While many Courts prefer to award fees based on a

23  percentage of the recovery, Courts often evaluate the size of the "lodestar" of plaintiff's counsel

24  (the hourly rate multiplied by number of hours spent) to the percentage fee requested as a "cross-

25  check" on the reasonableness of the requested percentage. *See, e.g., In re Activision Sec. Litig.,*

26  723 F.Supp. 1373, 1375 (N.D. Cal. 1989).  "In securities class actions, it is common for a

27  counsel's lodestar figure to be adjusted upward by some multiplier reflecting a variety of factors,

28                                                                       19

1  such as the effort expended by counsel, the complexity of the case, and the risks assumed by

2  counsel." *In re Heritage Bond Litigation,* 2005 WL 1594403,* 22 (collecting cases); *see e.g.,*

3  *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050-51 (9th Cir. 2002) (Ninth Circuit affirmed

4  attorneys' fee award equal to 3.65 multiple of lodestar); *In re Enron Corporation Securities,*

5  *Derivative & "ERISA" Litigation,* 586 F.Supp.2d 732, 751 n. 20 (S.D. Tex. 2008) (awarding

6  percentage fee equal to a multiple of 5.2 times lodestar); *In re Cardinal Health Inc. Sec. Litig.,*

7  528 F. Supp. 2d 752, 752, 767, 769 (S.D. Ohio 2007) (percentage fee equal to lodestar multiplier

8  of 5.9); *In re Rite Aid Secs. Litig,* 362 F.Supp. 2d 587, 588-90 (E.D. Pa. 2005) (multiplier of 6.96

9  confirmed reasonableness of percentage fee awarded).

10       Here, a comparison of the lodestar of Plaintiff's Counsel to the amount of the requested

11  attorneys' fees as a "cross-check" confirms the reasonableness of the fees requested. Plaintiff's

12  Counsel devoted approximately 1,706.45 hours to the prosecution of this litigation, representing a

13  lodestar of $913,560.00. Nobel Declaration, ¶¶6-7, 9, 13.[14] That the fee requested by Plaintiff's

14  Counsel ($810,000) is *less* than their lodestar further confirms the reasonableness of the requested

15  attorneys' fees.[15]

16           **3.    Plaintiff's Counsel's Costs and Expenses Were Reasonable**

17       Plaintiffs' Counsel also request reimbursement of $51,681.12 in expenses advanced or

18  incurred in connection with the Litigation, which is an amount that is less than the $55,000 listed

19  in the Notice. The expenses include customary fees and expenses, such as filing fees, travel

20  costs, copying expenses, postage costs, expert and investigator fees, and the costs of mediation.

21  *Nobel Declaration,* ¶¶ 8-10. Expenses are compensable in a common fund case if they are of the

22  type typically billed by attorneys to paying clients. *Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir.

23  [14]  Plaintiff's Counsel will have copies of their detailed time records at the July 28⋅ 2009 hearing
for the Court's *in camera* review, if requested by the Court.

24  [15] In addition to the attorney time devoted to date, Plaintiff's Counsel will also be required to

25  spend additional time in connection with the administration of the claims received from the
Settlement Class Members and the distribution of the Settlement fund, but do not seek any

26  additional compensation for these efforts. Although the attorney time required to perform these
tasks necessary for the proper distribution of a settlement fund varies in each case, Plaintiff's

27  Counsel reasonably estimate that approximately 200 additional hours may be required.

28                                                    20

1994).  Each of the expense categories for which reimbursement is sought is appropriate for

payment from a Settlement Fund and is of the type routinely charged to paying clients and,

therefore, should be reimbursed from the common fund.  As discussed above, there were no

objections to the request for reimbursement of the $55,000 in expenses described in the Notice.

### 4.   An Award to the Lead Plaintiff Is Appropriate

Plaintiff's Counsel also respectfully request that the Court grant the Lead Plaintiff

Expense Application and award $5,000.00 to Lead Plaintiff Frank Whiting pursuant to 15 U.S.C.

§78u-4(a)(4).  *See, e.g., In re CV Therapeutics*, No. C-03-3709 (SI), 2007 WL 1033478, *3 (N.D.

Cal. Apr. 4, 2007) (awarding $26,000 to lead plaintiff).  As set forth in his Declaration (attached

as Exhibit 5 to the Nobel Declaration), Mr. Whiting was extremely active in the case and devoted

a substantial amount of time assisting in the prosecution and settlement of this litigation,

including responding to discovery and being deposed in connection with the Motion for Class

Certification, review of court filings, correspondence, and numerous telephone conferences and

consultation with Plaintiff's Counsel concerning critical matters (such as settlement-related

matters).  Very unusually in the experience of Plaintiff's Counsel, following Mr. Whiting's

deposition Defendants effectively conceded class certification – surely a testament to the quality

of representation that he provided to the Class.  An award to Mr. Whiting will serve as

appropriate recognition for his efforts.

## IV.   CERTIFICATION OF THE SETTLEMENT CLASS IS PROPER

Plaintiff further requests that the Court certify the Settlement Class for purposes of this

Settlement.  Class certification for settlement purposes is appropriate because the four

prerequisites of Rule 23(a) and the requirements of Rule 23(b)(3) are satisfied.  Also, Defendants

have stipulated to certification for settlement purposes only.[16]

### A.   The Requirements Of Rule 23(a) Have Been Met

Rule 23(a)(1) requires that a class be sufficiently numerous such "that joinder of all

---

[16] Prior to this Court's ruling on the Motion to Dismiss, Defendants essentially conceded that Class Certification was appropriate.  *See* Docket Entry 51 (Nov. 10, 2005).

21

1  members is impractical." Although the Settlement Class's exact size is not known, the Complaint

2  alleges that there are thousands of members of the Settlement Class. Compl., ¶15. Accordingly,

3  the Settlement Class is sufficiently numerous that it would be impractical to join all of the claims

4  of Settlement Class members in one lawsuit.[17]

5      The "commonality" requirement of Rule 23(a)(2) has been satisfied in this case, as the

6  Complaint identifies several questions of law or fact that are common to the Class, including (a)

7  whether the federal securities laws were violated by Defendants' acts alleged in the Complaint,

8  (b) whether Defendants issued false and misleading statements during the Class Period, (c)

9  whether the market price of Applied Signal common stock was artificially inflated because of

10 Defendants' conduct alleged in the Complaint; and (d) whether the members of the Class have

11 sustained damages and, if so, what is the proper measure of damages. Such common questions

12 have been previously found sufficient to establish commonality in this Circuit. *See Blackie*, 524

13 F.2d at 902-03. [18]

14      Plaintiff's claims here are typical of the claims of the Settlement Class under Rule

15 23(a)(3) because his claims are based on the same legal claims as those of the class members, and

16 arise from the same course of conduct that give rise to the class's claims. *See Hanon* v.

17 *Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). Plaintiff – like all Settlement Class

18 Members – alleged that he purchased Applied Signal common stock at prices that were artificially

19 inflated through related misrepresentations over the course of the Settlement Class Period,

20 claimed that these misrepresentations constituted violations of Sections 10(b) and 20(a) of the

21 Securities Exchange Act of 1934, and further claimed that his losses were caused by these

22

23 [17] *See, e.g., Zhu v. The Fujitsu Group 401(k) Plan,* No. C-03-1148RMW, 2004 WL 3252573, at
   *5 (N.D. Cal. Mar. 3, 2004) (class of approximately 139 members sufficient to meet numerosity
24 requirement); *In re Emulex,* 210 F.R.D. at 719; *In re Adobe Systems, Inc. Sec. Litig.*, 139 F.R.D.
   150, 153 n.4 (N.D. Cal. 1991) (numerosity requirement clearly satisfied by allegation that
25 hundreds if not thousands of class members traded Adobe securities during class period).
   [18] *See, e.g., Blackie*, 524 F.2d at 902-03; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.
26 1998); *In re THQ Sec. Litig., supra,* 2002 WL 1832145, at *3 (C.D. Cal. 2002); *Zhu, supra,* 2004
27 WL 3252573, at *5.

28                                          22

1   violations of the securities laws.

2       The requirements of Rule 23(a)(4) are easily satisfied in this case. Plaintiff's Counsel are

3   qualified and experienced in class action litigation, and have done extensive work to date in

4   identifying and investigating potential claims in this action, preparing a detailed class action

5   complaint based, in part, on interviews with several former company employees, filing and

6   briefing a motion for class certification, successfully prosecuting an appeal of the dismissal, and

7   engaging in discovery. *See Emulex,* 210 F.R.D. at 720. Moreover, there is no conflict between

8   Plaintiff's interests and the interests of the Settlement Class Members.

9       **B.      The Requirements Of Rule 23(b)(3) Have Been Satisfied**

10      Common questions of law or fact predominate over any individual questions within the

11  meaning of Rule 23(b)(3). There are many common issues of fact or law in this case, including

12  whether Defendants' conduct violated the federal securities laws, whether Defendants made false

13  and misleading statements, whether the market price of Applied Signal common stock was

14  artificially inflated, whether the members of the Settlement Class have sustained damages and, if

15  so, what is the proper measure of damages. *Complaint,* ¶16. *See, e.g., Blackie,* 524 F.2d at 905-

16  08; *THQ,* 2002 WL 1832145, at *8; *Amchem Prods. v. Windsor,* 521 U.S. 591, 623 (1997)

17  (predominance test is readily met in securities fraud cases). These common issues easily

18  predominate over any potential individual issues, which would be minor in comparison. *Blackie,*

19  524 F.2d at 905-06.

20      Under Rule 23(b)(3) the Court must also determine whether "a class action is superior to

21  other available methods for the fair and efficient adjudication of the controversy." As the Ninth

22  Circuit explained in an analogous case, it is "difficult to imagine a case where class certification

23  would be more appropriate. Without it, thousands of identical complaints by former shareholders

24  would have to be filed – the very result the class action mechanism was designed to avoid."

25  *Epstein v. MCA, Inc.,* 50 F.3d 644, 668 (9th Cir. 1995). Rule 23(b)(3) provides four nonexclusive

26  factors to guide the Court in determining "superiority." An analysis of each of these four factors

27  under Rule 23(b)(3) confirm that a class action here is superior to individual actions. The first

28                                          23

1   factor (the interest of each class member in controlling the prosecution of separate actions)

2   supports the superiority of a class action here.  In a case with thousands of claimants, a class

3   member's interest in having the claims of the class aggregated in a single class action lawsuit

4   substantially outweighs a class member's interest in individual control of the litigation. *See, e.g.,*

5   *Zinser v. Accufix Research Institute,* 253 F.3d 1180, 1190 (9th Cir. 2001), *amended and*

6   *superseded by Zinser v. Accufix Research Institute,* 273 F.3d 1266 (9th Cir. 2001). Class actions

7   permit plaintiffs to pool claims that would be uneconomical to litigate individually, and "most of

8   the plaintiffs would have no realistic day in court if a class action were not available." *Phillips*

9   *Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985).  The second factor (the extent and nature of

10   any litigation concerning the controversy already commenced by members of the class) also

11   supports the conclusion that a class action is the superior method for the resolution of the claims

12   in the Complaint, Plaintiff's Counsel are not aware of any pending litigation in which the claims

13   at issue in this case are being separately pursued by any Settlement Class Members.

14   Consideration of the third factor (the desirability of concentrating the litigation of the claims in

15   the particular forum) further demonstrates that a class action is superior, as Applied Signal has its

16   corporate headquarters in this District, and most of the documentary evidence is located here.

17   Finally, the fourth factor (the difficulties that are likely to be encountered in the management of a

18   class action) confirms the superiority of having the claims of the Class resolved in a class action.

19   In this case, all of the claims alleged in the Complaint are governed by a single federal law

20   (Sections 10(b) and 20(a) of the Securities Exchange Act of 1934).  As there is no reason to

21   believe that the prosecution of the claims of Settlement Class Members in a single class action

22   will create *more* management problems than the alternative (*i.e.,* the prosecution of thousands of

23   separate lawsuits by each class member), class adjudication is clearly superior to any other form

24   of adjudication.

25

26

27

28

24

1    **V.**    **CONCLUSION**

2        For the foregoing reasons, the Court should grant final approval to the Settlement, grant

3 the Fee and Expense Application, and grant the Lead Plaintiff Award Application.

4 Dated: July 14, 2009

5                                   \s\
                                  Jeffrey S. Nobel
                                  Mark P. Kindall (Bar # 138703)

6                                   **IZARD NOBEL LLP**
                                  29 South Main Street, Suite 215

7                                   West Hartford, Connecticut 06107

8                                   *Lead Counsel for Lead Plaintiff*

9                                   Alan R. Plutzik (Bar #077785)
                                  **BRAMSON, PLUTZIK, MAHLER &**

10                                         **BIRKHAEUSER, LLP**
                                  2125 Oak Grove Road, Suite 120

11                                   Walnut Creek, CA 94598

12                                   *Liaison Counsel for Lead Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25